526 So.2d 292 (1988)
Mary Ann Knight Harmon BOCK and Alfred E. Harmon, Jr., Plaintiffs-Appellants,
v.
Alfred E. HARMON, Defendant-Appellee.
No. 87-328.
Court of Appeal of Louisiana, Third Circuit.
May 11, 1988.
*293 Joseph P. Anderson, Jr., Slidell, for plaintiffs-appellants.
Thomas D. Curtis, Juneau, Hill, Judice, Hill & Adley, P.C., John K. Hill, Jr., Pugh & Boudreaux, Charles J. Boudreaux, Sr., Lafayette, for defendant-appellee.
Before FORET, STOKER and DOUCET, JJ.
DOUCET, Judge.
Plaintiff, Alfred E. Harmon, Jr., (Fred), appeals from a judgment sustaining a plea of prescription raised by defendant, Dr. Alfred E. Harmon, plaintiff's father.
The disturbing allegations in this action by Fred, his sister, Mary C. Harmon, and their mother, Mary Ann Knight Harmon Bock, involve numerous acts of sexual abuse by Dr. Harmon against Fred and Mary and their brother and sister. Over a period of about six years, from approximately December 15, 1977, to August 22, 1983, Dr. Harmon allegedly gave his children drugs and alcohol, committed various sexual acts upon them, in private and in front of each other, and enticed them into performing numerous sexual acts upon him and each other.
Fred, born December 7, 1965, and Mrs. Bock, individually and as natural tutrix and on behalf of Mary, born June 15, 1969, filed this suit on June 11, 1986, seeking damages from Dr. Harmon. Dr. Harmon, who was absent from the state, was represented by court-appointed counsel. He raised an exception of prescription as to the claims of all parties. Plaintiffs subsequently added as defendants Northern Insurance Company of New York (Northern) and St. Paul Fire and Marine Insurance Company (St. Paul).
The exception of prescription as to Mary, a minor when suit was filed, was overruled. This ruling has not been appealed. As to the other exceptions, counsel for Dr. Harmon argued that on the face of the pleadings the suit had prescribed. Mrs. Bock, who was divorced from Dr. Harmon in 1971, sought damages for loss of consortium, service, and society of her children. Defendant argued that Mrs. Bock knew of the acts of sexual abuse as early as Spring 1983 when Fred and Mary's brother and sister made a complaint to officials of the Department of Health and Human Resources (DHHR) detailing the incidences of abuse. Therefore, it was submitted that prescription began to run as to Mrs. Bock at least as early as then. The trial court agreed and sustained Dr. Harmon's exception of prescription as to Mrs. Bock. She *294 has not appealed this ruling. However, defendants Northern and St. Paul have raised on appeal exceptions of prescription as to Mrs. Bock and Fred. Prescription can be raised on appeal. La.C.C.P. art. 2163. Therefore, we will examine the issue of prescription as it applies to Mrs. Bock.
Defendant also argued that Fred had one year from attaining the age of majority to institute suit. He turned 18 on December 7, 1983, continued to live with his father until October 1985, and thereafter moved to Hammond to live near his mother and sister. He argued that only after his father was arrested by federal authorities in February 1986, did he realize his father was not above the law and was answerable for his actions. Fred presented expert testimony from a psychiatrist to support his claims but the trial judge sustained defendant's exception of prescription.
La.C.C. art. 3492 provides a one-year liberative prescriptive period within which a delictual action must be brought. Prescription commences to run not necessarily on the date the injury occurs or the damage is sustained, but from the date the affected individual knows or should know of the injury or damage sustained. Dixon v. Roque, 503 So.2d 659 (La.App. 3rd Cir. 1987); Lynch v. Foster, 376 So.2d 342 (La. App. 3rd Cir.1979), writ denied, 378 So.2d 433 (La.1979).
Unquestionably Mrs. Bock's children were adversely affected by their father's abuse before Spring 1983. It is possible however, that she did not become aware of the years of abuse until two of her children complained to the DHHR. At this time, the two complaining siblings fully discussed with Mrs. Bock the abuse involving all of the children. At least as far back as Spring 1983, Mrs. Bock knew of her damages and should have instituted an action within one year. She did not and at the time this suit was filed in June 1986, her cause of action had prescribed. We will sustain the exceptions of prescription raised on appeal by defendants Northern and St. Paul as to the claim of Mrs. Bock.
Examining the issue of prescription as to Fred's claim we first recognize that prescription was suspended between Fred and Dr. Harmon until he attained age 18, the age of majority, on December 7, 1983. La.C.C. art. 3469; La.C.C. art. 29. Ordinarily, he would have had until December 7, 1984, to bring an action against his father for damages sustained by him as a result of the sexual abuse. Suit was not filed until June 1986, and on the face of the pleadings, Fred's cause of action had prescribed. In such a case the plaintiff bears the burden of establishing that prescription had not begun to run, or was interrupted or suspended. Andrus v. Patton, 394 So.2d 714 (La.App. 3rd Cir.1981); Steel v. Aetna Life and Casualty, 304 So.2d 861 (La.App. 3rd Cir.1974).
Plaintiff seeks to avail himself of the equitable doctrine of contra non valentum agere nulla currit praescriptio. This Latin phrase, taken literally, means that prescription does not run against one unable to act. Fred argues that the testimony of Dr. Richard P. Strobach, a psychiatrist, establishes that the abuse inflicted upon him by his father rendered him incapable of taking action earlier. Dr. Strobach examined Fred on one occasion in April 1986, shortly before this suit was filed. Fred also made a follow-up visit to him in October 1986. Dr. Strobach testified by deposition, taken after trial of the exception and filed in the record for review by the trial judge before rendering his decision on the exception.
The doctor felt that prior to February 1986, Fred was prevented from taking legal action against his father because: (1) of the fear that his drug use would be revealed, together with a fear of embarrassment about the sexual abuse; (2) the effect of Fred's ingestion, at the behest of his father of drugs and alcohol on his ability to recall the events that transpired; (3) Fred's use of avoidance and suppression measures to deal with the abuse inflicted upon him and his siblings by their father; and (4) his subjective belief that his father was omnipotent and that any action he took would be useless.
*295 After reaching the age of majority on December 7, 1983, Fred continued to live with his father in Crowley. He attended one-half semester at USL then began working. He did not move out of the house until October 1985, when he moved to Hammond where his mother and at least one sister resided. The acts of abuse ended in August 1983. Fred testified that he remained in his father's home in part because he made it "comfortable" for him to stay therehis father only charged him $100 per month for rent compared to $250 he would have had to pay elsewhere.
Fred testified that he began to open up about the abuse after his father was arrested by Federal authorities in February 1986, for an offense involving the sending of pornography through the U.S. Mail. Dr. Strobach felt that this was the turning pointnot when the abuse stopped or when Fred moved out of his father's home. Once his father was arrested, Fred realized that he was not omnipotent or above the law. This perception on the part of Fred was due partly to the fact that no action was ever taken against his father as a result of the complaints lodged by his siblings with the DHHR. Dr. Strobach believed that before Dr. Harmon was arrested Fred was incapable of assessing what had happened to him. Fred testified that he tried to put the events out of his mind and behind him in order to get on with his life. One of the reasons being that he thought any attempt to take action against his father would be fruitless. Fred also stated, however, that he "didn't know" he could do anything about it. This was an apparent reference to his right to institute a civil action against his father.
Dr. Strobach stated that, although Fred lived at home after reaching age 18, the presence of his father was only a slight influence on his reluctance to take action. Again he reiterated that the turning point was when the father was arrested. The doctor also recalled that Fred indicated to him that the drug Quaalude, which his father would give him before the sexual abuse, affected his appreciation of the events although he had a general cognizance of what had happened.
Dr. Strobach's written report showed that at the time of the examination in April 1986, Fred exhibited some anger and depression. He also wrote that Fred reported past and current depressive symptoms centering on: apathy, sad affect, agitation, sleep disturbance, and suicidal ideation. Everything else appeared normal in that Fred exhibited no symptoms of psychosis, no evidence of delusions, derealization, depersonalization, hallucinations, grandiosity, paranoia, or mania.
The doctrine of contra non valentem was examined in detail by the Supreme Court in Corsey v. State, Department of Corrections, 375 So.2d 1319 (La.1979). In Corsey, the court set out the three situations in which the principle of contra non valentem has traditionally been applied:
"(1) Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) Where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; and (3) Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action." (Footnotes omitted)
In these three instances, the plaintiff is prevented from enforcing an accrued cause of action by some reason external to his own will. The third situation appears to be the one in which the principle is most frequently applied.
In Corsey, the court also commented on a different fourth type of situation in which contra non valentem has been applied. This is where the cause of action is not known or is not reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. This appears to be similar to the general jurisprudential rule that prescription does not begin to run until the plaintiff receives knowledge of the injury or damage sustained. See Dixon v. Roque, supra; Lynch v. Foster, supra. A similar rule is also explicitly provided by statute for some causes of *296 action. See La.C.C. art. 189, 3493; La.R.S. 9:5628.
Disabilities of the person unrelated to any conduct of the defendant do not prevent prescription from running. Thus, a person whose ignorance of his cause of action or inability to assert it is the result of his own mental incapacity cannot claim the benefits of the principle of contra non valentem. Corsey, supra.
It seems clear to us that Fred knew of the events giving rise to a cause of action against his father and knew it was wrong to engage in such activities. Although the administration of drugs by his father may have partially affected a clear, precise recollection of specific acts of sexual abuse, Fred was all too aware and cognizant of the abuse. This is evidenced by his fear of embarrassment should the abuse be disclosed. The only possible application of the doctrine of contra non valentem in this case would come under the third category where the tortfeasor himself has done some act which effectively prevents the injured party from availing himself of his cause of action. In Corsey, supra, the doctrine of contra non valentem was extended by the Supreme Court for the first time to cover a situation in which the conduct of the tortfeasor which prevented the plaintiff from exercising his cause of action was the tortious act itselfnot separate conduct of the defendant such as might occur after the tort itself.
The facts of Corsey, supra, involved an inmate incarcerated at the Louisiana State Penitentiary who was stabbed in an altercation on June 18, 1972. It was alleged that the state was negligent in providing him medical care and as a result "the tort-caused physical and mental (brain) injuries to the plaintiff so mentally incapacitated him that he lacked any understanding of what had happened to him and of his possible legal remedies until July 1973 ..." Commenting on the res nova issue presented, the late then Justice Albert Tate wrote:
"[8] It is true that the usual case in which contra non valentem was applied on this ground has involved conduct of the defendant preventing the plaintiff's pursuit of his claimconduct separate from the wrongful conduct giving rise to the claim itself. We have not previously been confronted by a case in which the same wrong-doing that gave rise to the cause of action also made it impossible for the plaintiff to avail himself of his legal remedy because of the tort-caused mental incapacity. Nevertheless, we can discern no rational distinction which would justify us to apply contra non valentem in the former case, but not in the latter.
As Justice Provosty stated for this court in the Hyman v. Hibernia Bank & Trust, 139 La. 411, 417, 71 So. 598, 600 (1916), an `exception must be recognized, we think, in a case like the present, where the inability of the plaintiff to act was brought about by the practice of the defendant. Otherwise, the defendants would be profiting by their own wrong a thing inadmissible in law.'"
The facts of Corsey, supra, are, however, far different from those of the instant case. The mental incapacity of Corsey was apparently due to organic brain damage. Corsey filed his suit on June 25, 1974. As of November 26, 1976, he was still not ambulatory due to a balance problem. He was also left with a speech impediment as a result of the tort. In language which might well be interpreted as limiting the holding in Corsey to its facts, Justice Tate wrote:
"To permit prescription to run under the present facts would permit a defendant with custody and control over a person he had tortiously injured to profit by his subsequent laxity in medical treatment, when (as here stipulated) the injured person's recovery of mental faculties was retarded beyond the prescriptive period. The plaintiff in these circumstances is doubly helpless to file suit by virtue both of his mental incapacity and also of his removal from the solicitous attention of relatives and friends who might act in his stead."
Clearly Dr. Harmon took no affirmative overt action to prevent Fred from instituting a civil suit against him. Any psychological *297 block which Fred may have had about bringing a civil action against his father cannot really be compared to the organic brain damage suffered by the plaintiff in Corsey, supra. We can only imagine the conscious and subconscious avoidance and suppression measures this young man must have employed to continue functioning on a daily basis in high school and afterward. But after attaining the age of majority, Fred was free to move out of his father's home. He was not incarcerated as was the plaintiff in Corsey, supra. His mother and sibling(s) lived in Hammond and Fred visited them regularly. He chose to stay in his father's home because it was convenient.
Despite the horrible abuse inflicted by his father, Dr. Harmon was still Fred's father. We can fully understand the reluctance of a son to institute a civil action against his father. But it appears from the recordfrom a statement made by Fred that he had never even conceived that it was possible to sue his father, have him arrested yes, but sue him, no. Despite the suppression of the memories of these experiences, there is no question but that Fred was fully aware of the illegality and perverse nature of the things his father did. His failure to file suit was due to a number of factors, including embarrassment, fear of ridicule, a distorted view of his father's power and accountability for his actions, as well as a general ignorance of his legal remedies as an injured party. We do not mean to deprecate the psychological trauma Fred was experiencing but we are unable to apply the "exceptional" doctrine of contra non valentem to the facts of this case.
The sexual abuse of children by their parents will always result in some psychological trauma to the affected child. The victims of such abuse often suppress their feelings in an attempt to bury and forget the horror and guilt associated with this type of abuse. Confronting and dealing with these feelings can take years or even a lifetime. Perhaps the legislature would do well to consider enacting a statutory exception to the general rules of prescription in cases involving the sexual abuse of children by their parents. Until then, however, we are bound to follow the general laws of prescription.
For the reasons assigned the judgment of the trial court is affirmed. The exceptions of prescription raised on appeal by defendants Northern Insurance Company of New York and St. Paul Fire and Marine Insurance Company as to the claims of plaintiffs Mary Ann Knight Harmon Bock and Alfred E. Harmon, Jr. are sustained and the claims dismissed.
Costs of this appeal are assessed against plaintiff-appellant Alfred E. Harmon, Jr.
AFFIRMED, RENDERED.