545 So.2d 1180 (1989)
William W. STRATA
v.
Robert PATIN and the Roman Catholic Church, Archdiocese of New Orleans.
No. 88-CA-1636.
Court of Appeal of Louisiana, Fourth Circuit.
June 8, 1989.
*1181 Wayne M. LeBlanc, Metairie, for plaintiff/appellee.
Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, Michael T. Cali, Bryan C. Misshore, Francis B. Mulhall, New Orleans, for defendants/appellants.
Before GARRISON, KLEES and WILLIAMS, JJ.
WILLIAMS, Judge.
Defendants, Robert Patin and the Roman Catholic Church, Archdiocese of New Orleans, appeal from a jury award in favor of plaintiff, William Strata, in the amount of $100,000.00 for his suffering the loss of the chance to have a happy marriage; the loss of the love and companionship of his two children; the emotional and mental pain and anxiety caused by the loss of his family and by the doubts he now harbors towards the Catholic religion, caused by the alleged breach of fiduciary duty/clergy malpractice that occurred when Patin had an adulterous affair with Strata's wife when Patin was one of the Stratas' Parish priests.
Defendants contend that plaintiff's cause of action has prescribed as it is undisputed that plaintiff had knowledge of the romance between Patin and Mrs. Strata and of her resultant pregnancy, more than a year prior to filing suit.[1] Conversely, plaintiff claims, and the jury found, that plaintiff did not have sufficient knowledge of Patin's affair with Mrs. Strata more than a year prior to the filing of this suit and that prescription was suspended because plaintiff incurred a mental incapacity, caused by defendants, so that plaintiff did not understand that Patin had an affair with his wife until less than a year prior to filing this suit. After reviewing the law and evidence, however, we find the jury's findings are erroneous, reverse the judgment of the trial court and dismiss plaintiff's suit. Without doubt, plaintiff's cause of action had prescribed when suit was filed on August 23, 1985. Plaintiff had actual knowledge of the facts supporting his cause of action by August 12, 1984 and, as a matter of law, he did not suffer a mental incapacity sufficient to invoke the exceptional doctrine of contra non valentem.
FACTUAL AND PROCEDURAL HISTORY
Jill and Bill Strata's eleven year marriage was characterized by shouting matches and semi-violence. Bill claimed that throughout their marriage Jill suffered from hysterical rages. To make her snap out of these rages, he would occasionally strike her and/or force her out of the house with her arm twisted behind her back. Jill denied ever having hysterical rages, but claimed to suffer from migranes as a result of the occasion when Bill knocked her head into the car window. With marital problems such as these, the Stratas' sexual relationship had ceased by mid-1983 and by October, 1983 Jill had moved into a separate bedroom[2] within the Strata house.
*1182 By Fall of 1983, Jill had decided to leave Bill and in furtherance of that goal, she had begun saving money so that she and the children would be financially able to leave. At the same time, however, Bill was trying to make the marriage work by having "counseling sessions" with Father Michael Fraser. These counseling sessions occurred on Sunday evenings following dinner, when Father Fraser would attempt to improve the Strata's communication skills.
During this time period, Bill worked as a fireman with shifts of twenty-four hours on and forty-eight hours off, with part-time jobs during his off-time. Both he and Jill were active in organizing the St. Raphael's Parish fair and Jill was president of the Co-op Club. It was through these activities that she became involved with Father Robert Patin in December of 1983.
Jill initiated her affair with Patin in December and within a few months, the romance had not only been noticed by others but had also been publicized. A school newsletter, sent to the teachers and parish priests at St. Raphael's in February, 1984, even stated that it was obvious that Jill was fooling around with both Father Patin and Father Fraser. When Jill received this newsletter, she telephoned Bill at the station house and said, "You're going to find out about this anyway, so I'll read it to you." She then read him the newsletter and he replied, "Don't let that worry you, don't bother with it."[3] To compound this incident, in late January or early February, Bill's mother, Yvonne Strata, warned her son about Father Patin because she had heard rumors about Jill and because when she:
... went to the house to bring some carnival things [she] had made for [her] grandchildren and Jill came down and she stood in the doorway so [Yvonne] couldn't go in the house and [they] talked for a few minutes. Then [Yvonne] asked [Jill] whose car that was parked in front of the house and she said it was Father Patin's car. That just made, [Yvonne's] woman's intuition again [sic], just added to what [she] suspected in the beginning.
(tr. transcript March 9, 1988; pp. 116-117)
Yvonne Strata claimed she intuitively knew that something was going on between her daughter-in-law and Father Patin. So when Bill came over to her house on the weekend following this incident, she told him to forbid Father Patin from coming to his house. Bill, however, refused and his mother concluded that he did not believe the rumors.
On Easter weekend, April 20, 1984, Bill came home to an emptied house. Jill had cleared the house of its contents and moved in with her mother on Good Friday. Bill's reaction was to become very depressed and quite intoxicated. He then telephoned the priets, requesting that Father Fraser visit him. As Father Fraser describes the incident:
"... I wasn't too anxious to go to the home of anyone by myself knowing that *1183 that individual was inebriated and Bob [Patin] went with me. When we arrived there, Bill Strata had had plenty to drink. He was very depressed. The house was empty of furniture. Jill, when she moved out, had taken everything with her. So what was left in the house was basically Bill and the liquor and most of that was gone. We talked for a good while and Bill cried and then he said, pointing at Bob Patin, "They say my wife is fooling around with another man." He pointed at Bob specifically, "And they say it is you."
Q. This was Easter, 1984?
A. Yes, in April, 1984.
Q. Did Bob denydid he say anything at all?
A. Didn't say anything.
(tr. transcript, March 10, 1988; pp. 29-30)
About a week after she moved in with her mother, Jill learned she was pregnant with Bob Patin's child. When the Stratas' went to court to get their legal separation on June 20, 1984, Jill was three months pregnant. Bill described her as looking "heavy", but the evidence was inconclusive as to whether Bill realized she was enceinte.
Although Fathers Patin and Fraser were very close friends, Father Fraser had never suspected that Patin and Jill were having an affair. But then in late July, Patin was hospitalized for a week to ten days with severe depression. While hospitalized, Patin asked to speak to Father Fraser in confidence and he divulged to Fraser the reality of his liaison with Jill Strata.[4]
At trial, Bill admitted that after Jill left him, he began to hear "rumors about Jill". But Bill also claimed that in July, Jill began to harass him by telephoning him about an affair she was allegedly having with a fellow in Chalmette. When questioned about these harrassing phone calls, Jill denied making such calls and testified that she telephoned Bill only once, because:
A. On August 11th, it was a Saturday, I got a phone call from his mother, Bob's [Patin's] mother, and it was around 2:30 in the afternoon. She had asked me, she said, "Can you please come over?"
What happened was, Friday Bob took sick again, he was having
Mr. Cali: Q. Let me stop you there a second. What do you mean, took sick again?
A. In June when Bob had found out I was pregnant and that he would have to leave the priesthood, he was quite upset because he didn't want to have to leave the priesthood, when he found out I was pregnant he kind of had like a mental breakdown.
Q. Like a nervous breakdown?
A. Yes, that's what I mean.
Q. He was having sickness again, that kind of sickness again?
A. Yes.
Q. Around what, August 11th, did you say?
A. That Friday and Father Michael [Fraser] had picked him up and brought him to a doctor. I hadn't heard from Bob until that day, hadn't heard from his mother, but I did hear from Father Michael that night. That's how I found out they were treating him, gave him medication and stuff like that. Saturday I got a phone call from his mother and his mother had asked me to please come to her *1184 house but to see if my mother could watch my two kids.
I went over to his house and he saw me and I saw him, we hugged each other and she told me that she had sat down with him and talked to him and asked him what was going to behad to make a decision was he going to be with the church or me and he said, "It's going to be Jill."
Sunday I got a phone call at my mother's house from Monsignor Aleman.
Q. August 12th?
A. Right.

* * * * * *
Q. Go ahead.
A. Monsignor had told me Billy was in the office at the time and he wanted to know if Robert Patin was the father of my baby, and I told him no.

Q. Why did you tell him no?
A. Well, because with everything that was going on at the time with Bob, I didn't want anymore on his shoulders than what he could carry at the time.
Q. You were trying to protect him being the state he was in?
A. Yes. Then I called up my lawyer.

* * * * * *
I told her about Bob's sickness because she was aware of it happening the first time and I told her I received a phone call from Monsignor Aleman and what the conversation was about and I told her I told him no, that Bob was not the father and she said that was a mistake, should have told him yes, that he was.

Q. So she gave you legal advice to tell him?
THE COURT: Let her testify.
MR. CALL Excuse me.
THE WITNESS: So I hung up with her and called Father Aleman back and I admitted to Monsignor Aleman that it was.
After I hung up the phone with Monsignor Aleman, I called up Billy. I told Billy, I'm calling you up to let you know, yes, I'm pregnant....

* * * * * *
Q. Did you tell him who the father of the baby was?
A. Yes, I told him Bob Patin was the father of the baby. He said, "If I had known that I would have killed that bastard." I said, "that would make a lot of sense, he'd be dead and you'd be in jail, that makes a lot of sense."
Q. Did you speak to Bill again at any time on the telephone?
A. Between Tuesday and Thursday of the next week or the same week, if Sunday is considered the first day of the week. He called me up at my mother's house and he was telling me he was sorry for everything that happened and he knew it was all his wife and everything and that he would take me and the baby back and I said, "No, thank you."
Q. You weren't interested?
A. No.
Q. Did you ever tell Bill, aside from the telephone conversation with Monsignor Aleman, did you ever tell Bill you were not having an affair with Bob or the baby was not Bob's?

A. No.
Q. Did you ever deny it to anybody after August 12th, the date of the telephone conversation.

A. No.
(emphasis added; tr. transcript, March 9, 1988; pp. 224-230)
Thereafter, on Monday,
Father Fraser: August 13th, Bill rang the doorbell of the rectory, Monday night. There was a meeting going on down there. He was very angry and he told me I was going to be an uncle.
Mr. Cali: Q. What did you understand that to mean?
A. I asked him, "What do you mean?" He said, "Your buddy impregnated my wife."

Q. Who was he talking about, "your buddy"?

A. Bob Patin.

*1185 Q. Did you speak about it further?
A. I took him upstairs, there was a meeting going on downstairs and I didn't want this to spread. acted shocked, as if I didn't know anything about it. Of course, I already did because Bob had confided in me. Bill and I talked and I tried to calm him down a little bit and we had a long discussion. After Bill and I discussed the matter we went downstairs and we discussed it with Monsignor Vernon Aleman, the Pastor of the parish at that time.

* * * * * *
Mr. Cali: Q. When Bill came to speak to you about this, did he make a statement to you that this was going on, did he ask you questions, Father, is this going on?
Mr. LeBlanc: I think it's still a leading question.
The Court: You can answer it.
The Witness: He told me emphatically I was going to be an uncle, my friend had impregnated his wife.
Mr. Cali: Q. Again you acted surprised, why?
A. Because it was in confidence that Bob Patin told me he was the father of this child, that he had impregnated Jill Strata. I kept that confidentiality strictly, that was my duty as a priest.
Q. You didn't deny it to him, did you, you didn't tell him, no, Bob's not?
A. No. I received his words, that's what he knew.[5]
(emphasis added; tr. transcript, March 10, 1988; pp. 33-35)
Afterwards, Bill and Father Fraser spoke with Monsignor Aleman. When Bill departed, the Monsignor requested a conference with Patin at which time he pointedly inquired of Patin whether Jill's child was his. Patin denied paternity. The following day, however, after speaking with Monsignor Munsch, Patin publicly accepted paternity of Jill's child. He also wrote Monsignor Aleman a letter, acknowledging that Jill Strata was carrying his child.[6]
At the trial on the prescription issue, Bill testified that he did not believe the rumors about Jill and Patin circulating the parish in February, because rumors and jealousies were always floating around St. Raphael's Parish. Moreover, he never suspected the romance because it was his impression that Father Patin was too interested in being a priest. Consequently, despite all the circumstances described above, the event that first caused him to suspect that Jill and Patin were personally involved occurred on Labor Day weekend, 1984:
BY MR. LeBLANC: Q. ... when did you suspect it was Father Patin?
Bill Strata: A. Right around the beginning of school, right around Labor Day and I went and picked the kids up.

*1186 Q. And what happened?
A. He [Patin] pulled up, this is 9:30 in the morning and he has jeans, regular casual clothes on, which is something he doesn't wear. His normal outfit, black pants, red shirt, red socks and black loafers. His hair was sloppy, he never combed it, but his hair was combed. His general appearance was up a lot.
Q. What time of the morning was this?
A. 9:30.
Q. Besides his change in dress, how did you see him, what were those circumstances?
A. Excuse me?
Q. What were the circumstances of your seeing him that morning.
A. I was picking the kid up and he pulled up right afterwards and getting out the car heading into the house.
Q. Anything unusual about the car?
A. No, I wouldn't say anything unusual about the car, just found itwhy would he be there at 9:30 in the morning and dressed the way he was.
Q. Had you ever seen him dressed like that prior to this incident?
A. Never. Always wore the red socks, black pants, red shirt and loafers.
Q. Was that his usual wear?
A. Constant wear, except when on the altar.[7]
(tr. transcript March 9, 1988, pp. 167-168).
This event caused him to realize that Patin was the father of Jill's child and he announced this realization to his family at their Labor Day weekend picnic. He also told his fire captain, Clifford Wattingly, and his co-worker, Eugene Poirrier, that he found out on Labor Day weekend about Jill's affair with Father Patin.
To reinforce both this Labor Day time reference and Bill's new found realization, Yvonne Strata, Wattingly and Poirrier testified concerning Bill's depression and weight loss that followed Labor Day weekend. Even though his depression, crying spells and weight loss began April 20, 1984, these witnesses testified that his condition worsened in September. Bill's tears became more frequent and he started pacing at the firehouse. All total, he lost approximately forty to sixty pounds.[8] Wattingly also testified that Bill was sluggish, and hesitant at work. However, Bill's condition was not job threatening. Wattingly testified that Bill would not have been able to keep his job if he had ever become irrational or lost touch with reality.
On December 28, 1984, Jill delivered a daughter named Elizabeth. Thereafter she married Patin in March, 1985, when her divorce from Bill became final. Then on August 23, 1985, Bill filed the present lawsuit against Patin and the Catholic Church. Defendants initially filed a peremptory exception of no right and/or cause of action, contending that the petition should be dismissed as plaintiff was seeking civil damages for the alienation of his wife's affections, citing Moulin v. Monteleone, 165 La. 169, 115 So. 447 (1927). Plaintiff opposed the exceptions by maintaining that Patin and the Church, as marriage counselors, breached the duty they owed to him not to further harm his ailing marriage. After the trial court denied defendants' exceptions, on February 14, 1986, and declined to rehear the exceptions on April 13, 1987, defendants sought writ of certiorari from this Court, which was denied.[9]
Thereafter, a two-day trial commenced on October 12, 1987. Following the presentation *1187 of evidence, the jury found that Robert Patin did provide marriage counseling to Jill and/or William Strata; Robert Patin was at fault in breaching a legal duty to William Strata; the conduct of Robert Patin was a cause in fact of the injury suffered by William Strata; the plaintiff is entitled to recover $100,000.00 as a result of Robert Patin's conduct; and Robert Patin acted in the course and scope of his employment as an employee of the Archdiocese of New Orleans. The jury, however, did not reach a decision as to whether William Strata did "know, or have good reason to believe that Jill Strata has [sic] an affair with Robert Patin on or before August 23, 1984". Consequently, on December 3, 1987, the trial court granted a mistrial on the prescription issue only ordering that, as an exception of prescription was included in the answer, but not brought to the court's or the jury's attention during opening statements, the issue of "when did the plaintiff have knowledge of the relationship between his wife and the defendant Robert Patin" would be tried before a second jury. See LSA-C.C.P. arts. 1813(D)(E), 1971.
Subsequent to this ruling that ordered the second trial, plaintiff's counsel arranged for plaintiff to meet Dr. Scrignar, a forensic psychiatrist, so that the psychiatrist could "piec[e] together the history to try and construct some sort of estimate [of] what Mr. Strata's emotional health was during the time period of about one year...", from April 1984 to April 1985. (tr. transcript, March 9, 1988; p. 63). In order to make his evaluation, Dr. Scrignar met with Bill Strata on two occasions, once for forty-five minutes on February 24, 1988 and a second time for an hour and one-half on March 1, 1988. As part of Dr. Scrignar's evaluation, he gave Strata a symptoms inventory checklist form, listing fifty symptoms, which allowed Strata to check the intensity of his symptoms. Dr. Scrignar also read Bill Strata's deposition and his trial testimony from the first trial, as well as the trial testimony of Father Fraser, Clifford Wattingly, Eugene Poirrier and Catherine Squires.[10] At the second trial, Dr. Scrignar testified on a hypothetical basis, assuming that the testimony of Strata, Wattingly, Poirrier and Squires would establish that Strata suffered from insomnia, night pacing, fatigue, weight loss, anti-socialness and crying spells after Jill left him in April of 1984, with increased intensity after Labor Day Weekend of 1984. He also testified that Strata was depressed and under a great deal of stress which made him indecisive:
Mr. LeBlanc:
Q. Does this affect someone'swould this affect his ability to make decisions?
Dr. Scrignar:
A. I don't think there's any question about that, certainly would.
Q. What is that called?
A. Well, what happens is that when an individual is depressed and under a lot of stress, makes them indecisive, difficult to make a decision and interferes with one's cognition to comprehend, understand what's going on around them, interferes totally, they just can't do it or halfway. They don't appreciate what's happening to them because when a person is depressed they think bad things are happening to them, they don't problem solve, not very relaxed and I have a problem and I get a pencil and draw. If I'm upset with something that's happening to me, that's all in my mind. The depression, one of the key symptoms is what is called the person runs into a lot of cognition related to self worth, they're not worth very much, things are bad, sad, lots of negative thoughts. While you're under that situation it's difficult to appreciate what is going on around you.
(tr. transcript, March 9, 1981; pp. 73-75).
Thus, Dr. Scrignar concluded that Strata's severe depression "interfered with his ability to make decisions and to completely *1188 comprehend his current situation". (Id., p. 76). However, Strata's mental state was not constant during the year; there were fluctuations in his "mental competence":
Dr. Scrignar:
Obviously we are looking at a period of a year, his mental state wasn't exactly the same during that entire year. I think there are fluctuations at times, worse at time, better. This is not a concrete thing. You don't become mentally incompetent and remain there the rest of your life, you can fluctuate. You have to ask the question, what period of time are we talking about. I would say at the beginning when the wife left, that probably wasn't completely appreciated at that particular time period, talking about the circumstances of the pregnancy, these are the high points, when the man thinks his wife is pregnant by another person. That is a highly stressful thing. You wouldn't think clearly, and possible to do so. The various points that I mentioned I think a few moments ago, I can repeat them if you want. I think those are highly stress points and that stress and depression were present and this interfered with his mental competency psychiatrically, cognitive processes of his mind.
(emphasis added; tr. transcript, March 9, 1988; pp. 78-79).
Prior to the prescription issue jury trial, defendants urged the trial court to allow the jury to decide only the factual portions of the prescription issue, while the court applied the law to the jury's findings of fact. The trial court, however, declined to follow this request. At the conclusion of the second trial, held on March 9 and 10, 1988, the jury decided ten to two that plaintiffs did not "have sufficient knowledge by August 23, 1984 that Robert Patin had an affair with his wife" and decided eleven to one that the plaintiff did "incur such mental incapacity, which was caused by defendant, so as to be unable to understand that Robert Patin has an affair with his wife by August 23, 1984". Consequently, on March 14, 1988, the trial court rendered judgment in favor of plaintiff and against defendants, Robert Patin and the Roman Catholic Church, Archdiocese of New Orleans, in the amount of One Hundred Thousand ($100,000.00), plus interest from date of judicial demand until paid, and for all costs.
Defendants responded by filing motions for judgment notwithstanding the verdict, for new trial and/or for remittur, which the trial court denied. Being aggrieved, defendants filed this suspensive appeal. Plaintiff answered the appeal, requesting the jury award be increased to three hundred fifty thousand ($350,000.00).
PRESCRIPTION
Defendants contend that plaintiff's cause of action, filed August 23, 1985, has prescribed because plaintiff had actual knowledge several months prior to August 23, 1984 that there was a romance between Father Patin and Jill Strata. Alternatively, defendants contend that even if plaintiff did not have actual knowledge, plaintiff had constructive knowledge of his cause of action and plaintiff had a duty to make a reasonable inquiry as to the cause of and who had responsibility for his injuries, especially as his wife had left him and he knew of the rumors of her having an affair or affairs. Plaintiff counters these claims by asserting that the jury properly found both the discovery rule and the mental incapacity rule of the doctrine of contra non valentem applicable to his cause of action so that prescription was suspended until sometime after August 23, 1984. For the reasons set forth below, however, we find the jury manifestly erred by finding plaintiff's cause of action had not prescribed. Plaintiff had actual knowledge of the facts supporting his cause of action by August 12, 1984 and, as a matter of law, plaintiff did not suffer a mental incapacity sufficient to invoke the exceptional doctrine of contra non valentem.
Delictual actions in Louisiana are subject to a liberative prescription of one year, which commences to run from the day injury or damage is sustained. LSA-C.C. art. 3492. Jurisprudence has interpreted this rule to mean that prescription commences on the date the injured party *1189 discovers or should have discovered the facts upon which his cause of action is based. Griffin v. Kinberger, 507 So.2d 821 (La.1987); Lott v. Haley, 370 So.2d 521 (La.1979). When it is not obvious from the face of the petition, the burden of proving a tort action has prescribed rests upon the defendant or party pleading prescription. Pearson v. Hartford Accident & Indemnity Company, 281 So.2d 724 (La.1973); Dixon v. Houck, 466 So.2d 57 (La.App. 2d Cir.1985). Once it is proved that more than one year has elapsed between the time the tort occurred and the filing of suit, however, the burden shifts to the plaintiff to prove an interruption or suspension of prescription. Dixon v. Houck, 466 So.2d at 60. One such vehicle available to plaintiff, is the doctrine of contra non valentem.
In Corsey v. State, Through Dept. of Corrections, 375 So.2d 1319, 1321-1322 (La.1979), the Louisiana Supreme Court described the four categories of situations in which the principle of contra non valentem agere nulla currit praesciptio is applied to prevent the running of liberative prescription: 1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting upon the plaintiff's action; 2) where there was some conditions coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; 3) where the debtor himself has done some act effectively to prevent the creditor from availing himself of his cause of action; and 4) where the cause of action is not known or reasonably knowable by plaintiff, even though his ignorance was not induced by defendant. In this suit, the interrogatories given to the (prescription issue) jury, asked the jury to decide whether Corsey's third and/or fourth contra non valentem exceptions suspended the running of prescription on Strata's behalf. The jury found both exceptions applied; but for the reasons provided below, the jury erred.
The Fourth Exception: Where the Cause of Action is Not Known or Reasonably Knowable by Plaintiff, Even Though His Ignorance is not Induced by Defendant
One of the defenses available to a plaintiff who files suit tardily is the discovery rule embodied in the doctrine of contra non valentem, which suspends the running of prescription during the period in which his cause of action was not known or reasonably knowable to him. Griffin v. Kinberger, 507 So.2d at 823, citing Corsey v. State, Through Department of Corrections, 375 So.2d 1319 (La.1979). The rule provides that prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring suit, as long as such ignorance is not willful and does not result from his own neglect. Henson v. St. Paul Fire & Marine Ins. Co., 363 So.2d 711, 713 (La.1978), rehearing den.; Griffin v. Kinberger, 507 So.2d at 823 [as long as such ignorance is not willful, negligent or unreasonable]; Cartwright v. Chrysler Corp., 232 So.2d 285 (La.1970). This does not mean that a lack of actual notice of a cause of action will suspend prescription, cf. Henderson v. Todd Shipyards, 462 So.2d 242, 243 (La. 4th Cir.1984), writ den., 462 So.2d 1266 (La.1985), as constructive notice is sufficient to commence the running of prescription. Griffin v. Kinberger, 507 So.2d at 823.
Constructive knowledge or notice sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong. Griffin v. Kinberger, 507 So.2d at 823; Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574 (La.1980); Chandarlis v. Shah, 535 So.2d 895 (La. App. 2d Cir.1988). Prescription will commence only when plaintiff knew or should have known by exercising reasonable dilligence that tortious conduct occurred and that certain parties are responsible. As the Supreme Court explained in Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987), the language in Cartwright v. Chrysler Corp., that "... whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowlege as ought to reasonably put the owner on inquiry is *1190 sufficient to start the running of prescription", is an incomplete definition of the kind of notice that will start the running of prescription. As,
[p]rescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction....
Applying these principles to the present case, we find that defendants met their initial burden of showing more than a year elapsed between the time of their alleged tortious acts and the plaintiff's filing of this suit, as the evidence presented at trial[11] indicated that defendants' alleged tortious conduct began in December of 1983 when Jill Strata Patin initiated her extramarital affair with Father Patin. Thus, the burden shifted to plaintiff to prove an interruption or suspension of prescription. Dixon v. Houck, 466 So.2d at 60. To meet this shifted burden, plaintiff claims due to the discovery rule, prescription was suspended until Labor Day Weekend of 1984, so that his lawsuit filed on August 23, 1985 was filed timely.
To support his claim that the fourth contra non valentem exception applies, plaintiff postulates that his first evidence of the affair was on Saturday, September 1, 1984, when he observed Father Patin drive up to Jill's mother's house at 9:30 a.m., in Jill's car and wearing jeans and tennis shoes instead of his usual red and black clothing. Plaintiff claims that at that point in time, all of his perceptions "clicked" and he realized Jill was having an affair with Patin. Accordingly, he then announced to his family that Jill was having an affair with Patin. He claims that afterwards, his physical and mental health degenerated even more than it had after April 20th when Jill left him. This position, however, is contrary to all the evidence showing plaintiff's possession of constructive knowledge from February through August, 1984 and/or actual knowledge from August 12, 1984.
In the context of the facts that the Strata's marriage was troubled and Jill no longer occupied the same bedroom as plaintiff, defendants have a colorable argument that when rumors began to circulate through St. Raphael's Parish in early 1984 about Jill having an affair with Father Patin, plaintiff either knew or should have known by exercising reasonable dilligence, that the rumors were true. In fact, the rumors were so rampant that the February, 1984 teacher's newsletter declared that it was obvious that Jill was fooling around with both Fathers Patin and Fraser. Plaintiff had actual knowledge of this newsletter and its contents as it is uncontested that, without denying its veracity, Jill read the newsletter to plaintiff over the telephone as soon as she received it. Moreover, plaintiff's own mother warned him of her suspicions about Jill and Patin, especially after Jill would not let her into the house on an occasion when Patin's car was parked in front of the Strata home.
By the time Jill left plaintiff on Good Friday, plaintiff's actions indicated that he knew the (newsletter) rumors of the affair related solely to Father Patin and not to both priests. For on Easter Sunday, when both priests were at the Strata home consoling plaintiff, plaintiff pointed to Father Patin specifically and exclaimed, "They say my wife is fooling around with another man. And, they say it is you."[12] Furthermore, although plaintiff denies having knowledge of Jill's pregnancy prior to August *1191 12th[13], he admitted that he thought Jill looked heavy when he saw her in May, in front of the school, and in June, at the separation hearing. Consequently, in light of their non-existent sex life and the other facts discussed supra, plaintiff should reasonably have been alerted to the fact that Jill was having an affair and, if that fact caused him injury, he should have sought out those whom he believed were responsible for his injury.[14]
Nevertheless, when Jill telephoned plaintiff on August 12, 1984 and informed him that she was having an affair with Patin, was pregnant by him and was going to marry him,[15] constructive knowledge of what plaintiff reasonably knew or should have known by exercising reasonable dilligence transformed into actual knowledge because plaintiff was no longer ignorant of the facts on which his cause of action is based. Moreover, plaintiff's actual knowledge of Patin's involvement with Jill was reaffirmed by the remarks plaintiff made to Father Fraser at the rectory on August 13, 1984, in regard to Fraser being "an uncle" because Patin "impregnated" Jill. The remark went uncommented upon by the priest(s) and its truth was not denied by any of the defendants.
It is important to note that on the occasions when plaintiff's statements alluded to rumors of the affair or accused Father Patin of fathering Jill's child, neither Father Patin nor Father Fraser denied the accuracy of the statements. For a defendant to conceal his identity "by silence alone is not enough to toll the running of prescription ... he must be guilty of some trick or contrivance tending to exclude suspicion and prevent the plaintiff from bringing his action." Patin v. Stockstill, 315 So.2d 868, 873 (La.App. 1st Cir.1975); Bill Nolan Livestock, Inc. v. Simpson, 402 So.2d 214 (La.App. 1st Cir.1981), writ den., 404 So.2d 1260 (La.1981); Reed v. General Motors Corp., 400 So.2d 919 (La.App. 1st Cir.1981), writ den., 406 So.2d 625 (La. 1981); Gover v. Bridges, 497 So.2d 1364 (La.1976), [the defendant/physician's letter to plaintiff that contained misstatements of fact concerning what occurred during decedent's hospitalization did not approach the level of concealment, fraud or misrepresentation that prevented the timely filing of suit so as to interrupt or suspend prescription]. Consequently, the silences or non-responsiveness of Fathers Patin or Fraser to plaintiff's remarks, did not affect the running of prescription.
Without doubt, after considering all the evidence and accepting it in plaintiff's favor, we find plaintiff's ignorance of the existence of the facts upon which he filed suit ceased on August 12, 1984. Thus, the determination of the point in time when prescription began to run because plaintiff had constructive knowledge of the existence of facts that would have entitled him to bring this clergy malpractice/breach of fiduciary duty cause of action is moot. The evidence showing plaintiff had actual knowledge of the existence of the pertinent facts by August 12, 1984 is so overwhelming, that no reasonable person applying the *1192 discovery rule could have found that this lawsuit filed on August 23, 1985 was filed timely. Therefore, the jury manifestly erred when it found to the contrary.
The Third Exception: Where the Debtor Himself has Done Some Act Effectively to Prevent the Creditor From Availing Himself of His Cause of Action
The jury also found that plaintiff incurred such a mental incapacity caused by the defendants, that prior to August 23, 1984, he was unable to understand that Patin had an affair with Jill. In support of this finding, plaintiff claims that the third contra non valentem exception suspended prescription until after August 23, 1984 because he had a mental incapacity characterized by severe emotional distress, anguish and depression that caused him to fall into a state of confusion and detachment from April 1984 to April 1985. Alternatively, plaintiff claims this state of confusion prevented him from assimilating Jill's August 12th confession as well as all other facts of the affair until September 1, 1984 when he saw Father Patin wearing jeans and tennis shoes at 9:30 a.m. at Jill's mother's house. We find as a matter of law, however, that the psychological trauma experienced by plaintiff did not rise to the requisite level of incapacity needed to invoke contra non valentem.
Plaintiff's claims of an incapacitating psychological trauma relate to the third contra non valentem exception which suspends prescription during the time when a defendant's tortious conduct produces a mental and/or physical incapacity in a plaintiff, rendering him unable to file suit. The hallmark case applying this exception, Corsey v. State, Through Dept. of Corrections, supra, extended the application of the doctrine to those instances where the same wrongdoing that gave rise to the cause of action also made it impossible for the plaintiff to avail himself of his legal remedy because of the tort caused incapacity. Corsey, applied this contra non valentem exception to facts where the plaintiff's tortious injuries were sustained as a result of the Department of Correction's negligence and those injuries (organic brain damage: plaintiff could not speak, hear well or make himself understood) so mentally incapacitated the plaintiff that he lacked any understanding of what had happened to him until less than one year prior to filing suit when he recovered his awareness of both the events and his condition.
Since Corsey, other plaintiffs have unsuccessfully attempted to apply this exception to the Battered Woman's Syndrome, Laughlin v. Breaux, 515 So.2d 480 (La. App. 1st Cir.1987) [claimed her condition was characterized by a learned helplessness that prevented her from filing suit]; to sexually abused children who had attained majority, Bock v. Harmon, 526 So.2d 292 (La.App. 3d Cir.1988), writ den., 531 So.2d 275 (La.1988) [held: the pychological block that the plaintiff/son may have had about bringing a civil action against his father is not comparable to the organic brain damage suffered by the Corsey plaintiff. Although plaintiff must have employed conscious and subconscious avoidance and suppression measures in order to function with his psychological trauma, it is not sufficient for the application of the "exceptional" doctrine on contra non valentem.]; and to sexually molested minor church members who had attained majority, Doe v. Reverend H. Doug Ainsworth, 540 So.2d 425 (La.App. 1st Cir.1989) [the plaintiff alleged that he was homosexually molested by the defendant/Reverend when he was a minor and a member of defendant's church and that defendant psychologically dominated him, which caused him to suppress his realization of the defendant's conduct; nevertheless, contra non valentem did not apply as plaintiff had visited a psychiatrist three years before filing suit so that he had constructive knowledge of the defendant's actions]. In these cases, there was credible evidence that the plaintiffs had been traumatized by the conduct they allegedly suffered at the hands of their respective defendants. But as the plaintiffs were not mentally and physically incapacitated like the Corsey plaintiff[16], it was found that their psychological *1193 traumas, as a matter of law, did not rise to the requisite level of incapacity needed to invoke the "exceptional" doctrine of contra non valentem. See Bock v. Harmon, 526 So.2d at 297.
Likewise, the emotional trauma that Strata experienced[17] is not an incapacity sufficient to invoke the third exception of contra non valentem. Throughout the relevant time period, plaintiff remained employed and continued to function in society. His alleged depression and emotional distress, characterized by weight loss, insomnia, night pacing and crying spells may be a psychological trauma, but it is not a mental incapacity which prevented plaintiff from timely instituting this suit. Any mental confusion or detachment that plaintiff may have had is not comparable to the Corsey plaintiff's mental incapacity. And unlike the Corsey plaintiff, plaintiff was not under the physical control of the defendants[18], and the defendants did nothing to cause this plaintiff to refrain from timely filing suit. Thus, the trial court erred by refusing defendants' request to strike jury interrogatory number 2, which asked whether plaintiff incurred such a mental incapacity, caused by defendants, so as to render him unable to understand that Robert Patin had an affair with his wife prior to August 23, 1984, and erred by placing the issue of plaintiff's mental incapacity before the jury.
For the reasons assigned, after considering all the evidence and accepting it in plaintiff's favor, we find the law and the evidence presented to the jury on the issue of prescription was so overwhemingly in favor of defendants that reasonable persons could not have found that plaintiff did not have sufficient knowledge of Patin and Jill's affair after August 12, 1984 or that plaintiff suffered a mental incapacity so that prior to August 23, 1984 plaintiff was unable to understand that Jill and Patin had an affair. Accordingly, the findings of the jury are annulled, the judgment of the trial court is reversed and the plaintiff's claims are dismissed. All costs are assessed against the plaintiff/appellee.
REVERSED.
NOTES
[1] Defendants' appeal raises fourteen assignments of error, including no right of action, no cause of action, no evidence, no causal connection and prescription. As we find the prescription defense definitive, defendants' remaining contentions are pretermitted.
[2] After October, 1983 the Stratas had sexual intercourse on only one occasion, when Jill became intoxicated.
[3] Mr. LeBlanc: Q. Did you try to calm him, did you deny it to him, did you deny the fact [sic] of that letter to him?

Jill Strata Patin: A. I didn't say anything except let me read this to you because you're going to find out about it anyway and that was it.
Q. He tried to console you?
A. No, he didn't console me. I read it to him and he said, "Don't worry about it."
Q. But he wouldn't worry about it?
A. No.
Q. You-all were still living in the same house at that time?
A. Same house, separate rooms.
Q. At that same time you had already started your sexual affair with Father Patin in the same house also?
A. Yes.
Q. You didn't admit to him at that time the contents of the letter was true, did you?
A. No.
Q. Why not?
A. Well, to be perfectly honest with you, I feel I had moved into a separate room in October, this so-called marriage that was supposed to be able to be savednot once did he ever try and come to try to coax me into another room or say we can make things work out if we really try. Nothing was ever mentioned about saving the marriage. I just wanted him to be aware of the letter I had gotten. I didn't really feel like I had to tell him what I was doing. He wasn't interested. So I certainly wasn't interest in him anymore.
(tr. transcript, March 10, 1988; pp. 6-8)
[4] At trial, Father Fraser expanded upon the circumstances of this confidence:

Father Fraser: A. Bob Patin was hospitalized with, I guess, lack of a better expression, severe depression. I went to the hospital at his request to speak with him. When I arrived there he asked that we speak in confidence. He told me that he had had a relationship with Jill Strata.
Mr. Cali: Q. Did you immediately go out and tell anybody about this relationship?
A. No, it was in confidence, I couldn't.
Q. Is a priest bound by ethical contraints not to say anything like that?
A. Absolutely.
Q. You were not even at liberty to tell anyone?
A. I didn't even discuss it with Jill.
Q. Did you discuss it with anybody after that time?
A. No.
(Tr. transcript, March 10, 1988; p. 32)
[5] The following two excerpts provide Bill's version of this incident:

Bill Strata: She [Jill] called me up and told me the guy she was having an affair with was Father Patin. I couldn't get in touch with anybody else. I said, I'll go talk to Father Fraser. I walked in and saw Fraser and I saw they had people in the rectory. I didn't know how I was going to get him by himself. So I guess I just said, "Congratulations, you're going to be an uncle," and he just looked at me like what are you talking about? And he pulled me into his office and we sat down. We talked a little bit. Like I told him, now she's blaming Patin.
(tr. transcript, March 9, 1988; pp. 163-164)
Mr. Leblanc: Q. When you told Father Fraser about the uncle what was his reaction?
Bill Strata: A. Surprise, like what is this, like he never heard about it.
Q. What is the relationshipdo you know if there's any relationship between Father Fraser and Father Patin?
A. They were best friends.
Q. What did you expect Father Fraser [to do] when you confronted him with this information?
A. Really I just thought he would laugh.
Q. Why?
A. Well, because what's going on, I just figured now it is your best friend, I just figured he would just laugh.
(tr. transcript, March 9, 1988; pp. 165-166).
[6] When questioned by plaintiff's counsel whether he had concealed the affair after receiving Patin's letter, Monsignor Aleman replied that he did not remember discussing the matter with Strata as Strata discussed the affair/paternity matter with Father Fraser directly. Monsignor Aleman testified that he did not interfere because he did not feel it was his business.
[7] The defendants' witnesses placed this event as occurring in July for the reason that Jill moved out of her mother's house on August 17th and it is uncontested that the incident occurred at Jill's mother's house. Moreover, Jill and her mother did not speak from August 17th till the baby was born December 29, 1984, because her mother did not approve of the Patin affair.
[8] Bill Strata had weighed approximately 220 lbs. prior to April 20, 1984. Strata also admitted that he sold and used Herbalife during the Fall of 1984.
[9] On April 28, 1987, this court denied defendants' application for certiorari stating, "The application and response considered, we decline to exercise supervisory jurisdiction or to interfere with the orderly process of the trial court".
[10] Squires is a friend of both Jill Strata Patin and Bill Strata. She testified about how surprised she was over Bill's weight loss, depression, etc. when she saw him around Christmas of 1984.
[11] All references to evidence and testimony presented at trial indicates the second trial, held March 9 and 10, 1988, which solely addressed the issue of prescription.
[12] It is important to note that neither priest denied the truth of plaintiff's remark. Instead, Fathers Fraser and Patin merely did not respond to plaintiff's remark.
[13] Jill testified that Bill admitted to her that he knew she was pregnant at the separation hearing.
[14] Plaintiff claims that in July, Jill began harrassing him with the telephone calls about an affair with a man in Chalmette. If this allegation is true, it is no reflection on the defendants and it does not effect plaintiff's duty to reasonably investigate the possibility of its truth.

The doctrine of contra non valentem agere nulla currit praescriptio applies where the defendant conceals information or misleads plaintiff and lulls plaintiff into inaction. Gover v. Bridges, 497 So.2d 1364 (La.1986); Richards v. LaCour, 515 So.2d 813 (La.App. 3d Cir.1987); writ den., 519 So.2d 133 (La.1988); Reed v. General Motors Corp., 400 So.2d 919 (La.App. 1st Cir.1981) writ den., 406 So.2d 625 (La.1981). Jill is not a defendant; consequently, her actions are those of a third party.
[15] Chronologically, on August 24, 1984 Jill received the telephone call from Monsignor Aleman. In the presence of plaintiff, Monsignor Aleman inquired whether Jill and Patin were having an affair. At that time, she denied her romance with Patin. Subsequently, she telephoned plaintiff and told him that she was having an affair with Patin and was pregnant by Patin and was going to marry him. Plaintiff asserts that within a few days of this call, she telephoned him again and recanted these statements. However, evidence of that phone call is dubious.
[16] In Corsey, the Supreme Court reasoned that to permit prescription to run under the facts presented, would permit a defendant with custody and control over a person he had tortiously injured to profit by his subsequent laxity in medical treatment, when (as the parties had stipulated) the injured person's recovery of his mental faculties was retarded beyond the prescriptive period. The plaintiff in such circumstances is doubly helpless to file suit by virtue both of his mental incapacity and also of his removal from the solicitous attention of relatives and friends who might act in his stead. 375 So.2d at 1324; Accord Kozlowski v. State, Through Department of HHR, 534 So.2d 1260 (La.App. 5th Cir.1988), writ den., 538 So.2d 592 (La.1989).
[17] There is a viable issue of causation as to whether Strata's alleged psychological trauma was a result of the Strata's separation and divorce or of the priest/church's involvement in the matter.
[18] Cf. Kozlowski v. State, Through Dept. of HHR, 534 So.2d 1260 (La.App. 5th Cir.1988), writ den., 538 So.2d 592 (La.1989) [contra non valentem prevented the running of prescription against the minor plaintiff during the period he was in the legal and physical custody of the defendant DHHR when, allegedly due to the defendant's negligent failure to investigate the plaintiff's original complaints of the child's abuse, the injury which gave rise of the cause of action occurred. The minor under these circumstances is doubly helpless to have suit filed on his behalf by virtue of both his age incapacity and also his doubtless dependency for protection of such rights on the same entity whose alleged negligence has allowed the child to come into its custody so severely injured.].