792 So.2d 798 (2001)
Traci Book CRUSE, Plaintiff-Appellant,
v.
LOUISIANA STATE UNIVERSITY MEDICAL CENTER, Defendant-Appellee.
No. 34,779-CA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 2001.
*800 Koederitz Law Firm, L.L.C by Gary P. Koederitz, Baton Rouge, Counsel for Appellant.
Louisiana Department of Justice by John F. Frederickson, Assistant Attorney General, Counsel for Appellee.
Before GASKINS, CARAWAY & PEATROSS, JJ.
PEATROSS, J.
In this medical malpractice case, the trial court granted an exception of prescription filed by Defendant, Louisiana State University Health Sciences Center-Shreveport ("LSU Health Sciences Center"), formerly known as Louisiana State University Medical Center.[1] For the reasons stated herein, the judgment of the trial court is affirmed.

FACTS
On August 25, 1995, Plaintiff, Traci Book Cruse, underwent breast reduction surgery at LSU Health Sciences Center. Her last post-operative visit at the hospital occurred on November 2, 1995. In February 1996, Ms. Cruse's personal physician, Dr. Ronnie Gregg, removed a benign mass from the area of her right breast; her last post-operative visit with Dr. Gregg occurred in March 1996. On November 20, 1997, Ms. Cruse filed a complaint with the Commissioner of Insurance for medical malpractice against LSU Health Sciences Center.
In her complaint, Ms. Cruse asserted that after her surgery in August 1995, the treating physicians at LSU Health Sciences Center advised her that, because of the complications surrounding her surgery, it would take two years for her to heal and recover from the surgery. Ms. Cruse asserted that, as a result of the alleged negligent *801 and improper medical treatment, she had sustained permanent damage to both breasts, permanent disfigurement and medical bills. She itemized her damages to include mental pain and suffering, physical pain and suffering, medical expenses, loss of wage-earning capacity and disfigurement.
Subsequently, in answer to an interrogatory seeking information concerning the specific nature of the alleged acts or omissions, Ms. Cruse stated that, while she did not yet know all the acts or omissions for which LSU Health Sciences Center was responsible, she believed the following acts and omissions occurred:
a. The doctors employed by defendant informed Traci Cruse that she would undergo a breast reduction procedure so that she would be changed from a bra size of G to a large size C or small size D; in fact, since the procedure performed by defendant's physicians, plaintiff's breasts are even smaller than a size A bra cup. Defendant's physicians assured Traci Cruse that it would take at least two years for her breasts to return to a large C or small size D cup.
b. Traci Cruse was informed by the defendant's physicians that her breasts would fill out two or more years subsequent to the surgery, but that has never occurred.
c. Traci Cruse now has lumps under her arms which the defendant's physicians told her would resolve two or more years after the surgery, and which have never resolved; these lumps are now larger than her breasts.
d. Both of plaintiff's nipples fell off of her breasts following the surgical procedure; the defendant's physicians assured her that both nipples would come back two or more years after the surgery; only one has reappeared.
e. Traci Cruse has continued to have headaches and breast pain since the surgery was performed; the defendant's physicians have assured her that those conditions would resolve two or more years after the surgery, but neither has resolved to any extent.
f. Prior to the surgery, Traci Cruse had shoulder and back pain, which defendant's physicians assured her would be relieved by the surgical procedure beginning two or more years after the procedure; since the surgery was performed, plaintiff has continued to experience shoulder and back pain.
Another of LSU Health Sciences Center's interrogatories requested Ms. Cruse to state whether she or anyone acting on her behalf had been advised by any physician or other expert that the treatment given by LSU Health Sciences Center was in any way below the applicable standard of care during the year 1995. Ms. Cruse gave the following answer to that interrogatory:
Traci Cruse does not know whether the following statements by Dr. Gregg indicate treatment "below the applicable standard of care" or not. Dr. Gregg stated to Traci Cruse that she had no breast tissue left in her breasts, that it was not true that the lumps under her arm would disappear and that they would instead need to be removed by a surgical procedure, and that, upon examining her breasts, the defendant's doctors has "messed her up." Traci Cruse does not know the date on which those statements we [sic] made, other than they were during at least one of her appointments with Dr. Gregg following *802 the surgery by defendant's physicians.
Ms. Cruse's answers to interrogatories, including those set forth above, were certified by her on November 14, 1998. On August 1, 2000, LSU Health Sciences Center filed a peremptory exception of prescription alleging that Ms. Cruse's claims for malpractice had prescribed on their face because her complaint was filed on November 20, 1997, two years and three months after the date of the surgical procedure. Attached to the peremptory exception of prescription were copies of Ms. Cruse's complaint, her responses to interrogatories, a copy of the discharge summary from her medical chart, the deposition of Dr. Gregg and the deposition of Dr. Marshall Cunningham who treated her at LSU Health Sciences Center. Ms. Cruse responded with a memorandum in opposition to which she attached her own deposition taken on August 25, 2000. The parties entered into a joint stipulation wherein they agreed that all exhibits, documents and depositions pertaining to the exception of prescription would be submitted into evidence as part of the record for purposes of adjudicating the exception. The parties further stipulated that the depositions submitted were in lieu of live testimony for purposes of the exception of prescription.
Ms. Cruse's deposition essentially reiterated the information provided in the above-quoted answers to interrogatories. With respect to her visits with Dr. Gregg in 1996 in which he allegedly told her that the doctors at LSU Health Sciences Center had "messed her up," Ms. Cruse explained that Dr. Gregg never "got into detail about what he meant," but she assumed that he was referring to the scarring; however, he never told her that the doctors at LSU Health Sciences Center had committed malpractice. When Ms. Cruse was asked if Dr. Gregg said anything about the lumps under her arms, she responded affirmatively and explained:
The only statement he made about the lumps under my arms is that normally like with the drain tubes if they haven't went away in like three or four months, they could eventually have to be took off.
Ms. Cruse was also asked what prompted her to go to an attorney in November of 1997. She responded:
Well, I took the doctors at their word that it would take two years to heal, and after the two-year period when I still hurt and my breasts still hadn't formed, the knots hadn't went away, one of my nipples had not returned, I just assumed after that timethen I knew they were wrong.
Dr. Gregg testified in his deposition that he had treated Ms. Cruse for various medical problems prior to 1996. In February 1996, she was referred to him for evaluation and treatment of a mass of the right breast. After examining her, he confirmed the presence of a well-delineated mass in the inferior aspect of her right breast and performed a needle biopsy. Although the report indicated the mass was benign, he concluded the mass should be removed, and he performed surgery to remove the mass on February 28, 1996. When asked whether the mass was associated with her prior breast surgery, he stated that, in retrospect, he "would have to say there's a possibility it was, yes." Dr. Gregg did not recall if he had related that to Ms. Cruse, but he stated that he probably did not do so because his emphasis was directed primarily toward whether or not the mass was malignant. Dr. Gregg had no record of Ms. Cruse reporting to him any complaints regarding her prior breast reduction surgery, and the referring physician did not indicate any such complaints by *803 Ms. Cruse. In addition, Dr. Gregg did not recall making any comments to Ms. Cruse regarding her breast reduction surgery and had no record of such comments. He also did not recall if Ms. Cruse expressed any concern to him regarding her breast size, and he only recalled that she made "very little comments" about her breasts. Dr. Gregg also stated that he did not recall providing her with any medical advice regarding potential future treatment related to her breast surgery. The only thing Dr. Gregg stated that he might have mentioned to Ms. Cruse, although he reiterated that there was nothing in his records to confirm it, was that the nipple transplant surgery which she obviously had received would not have been his primary choice of procedures. He testified, however, that the results he viewed on February 20, 1996, "were very typical" of what he would expect to see from a nipple transplant reduction technique. He also stated that, while the technique was not the one he would have chosen, that did not mean that the technique was wrong.
Dr. Cunningham's deposition testimony reveals that he is board certified in plastic and reconstructive surgery and trained in hand and microvascular surgery. At the time of Ms. Cruse's surgery, Dr. Cunningham had been practicing medicine since 1984, and was the chief of the Department of Plastic and Reconstructive Surgery at LSU Health Sciences Center. He was familiar with Ms. Cruse and had an opportunity to review her chart prior to giving his deposition. Dr. Cunningham indicated that Ms. Cruse's surgery took place on August 25, 1995; that she subsequently was discharged from the hospital on August 31, 1995; and that she then came to the clinic for a routine follow-up at which time she was doing very well. According to Dr. Cunningham, no problems were noted on her first visit. Similarly, on her next visit, no problems were noted and she was asked to return to the clinic on November 2, 1995. She did return on that date, and that was her last visit. At that time, Dr. Cunningham indicated she had no complaints other than needing dressings. Ms. Cruse was given dressings and "had a few little normal post-op things such as a little abrasion of the skin." Dr. Cunningham related that Ms. Cruse also had "some little stitch granuloma, all within normal limits for somebody having this type of surgery."
Dr. Cunningham was asked whether Ms. Cruse would have been advised of the approximate length of time that healing would take with respect to her breast reduction surgery. He responded by indicating that most patients are told that, for the first four weeks, they would have to be very protective of their incisions, wear supportive bras and minimize their physical activities. Then, after about four weeks, they could go out and do normal activities and "pretty much by about three months they are back to normal." When asked whether Ms. Cruse would have been advised by him that she would have to wait approximately two years or more for the breasts to fully fill out and obtain maximum appearance, Dr. Cunninham responded "[a]bsolutely not." He also was asked if any residents under his supervision might have so indicated to her, and he again responded, "[a]bsolutely not also (sic)." In addition, Dr. Cunningham stated that he would have been in a position to know if a resident would have given such a response to Ms. Cruse.
Dr. Cunningham further testified that it was "pretty much normal" for all breast reductions with free nipple grafts to have some epidermal lysis, or sloughing where the external layer of skin would peel off, much like after a bad sunburn. He indicated that it would be totally inaccurate to *804 say that a nipple "fell off," but that the patient might perceive it that way.
Next, Dr. Cunningham testified that he did not have any discussion with Ms. Cruse, nor does he with any patient, regarding what might be expected in terms of any change in neck or back pain after breast reduction surgery. Finally, when asked if any photographs were taken in this case, Dr. Cunningham responded in the affirmative and indicated such photographs were taken to have a record of how patients looked preoperatively. He stated that he was the custodian of the photographs and that arrangements could be made for opposing counsel to obtain copies of the photographs.
On September 20, 2000, the trial court rendered judgment, sustaining the exception of prescription and dismissing Ms. Cruse's demands with prejudice at her costs. This appeal followed.

DISCUSSION
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). The manifest error standard of appellate review applies even when the evidence before the trier of fact consists solely of written reports, records and depositions. Williams v. Jackson Parish Hospital, 31,492 (La.App.2d Cir.1/13/99), 729 So.2d 620, writ denied, 99-0458 (La.4/1/99), 742 So.2d 558. In Shephard on Behalf of Shephard v. Scheeler, 96-1690 (La.10/21/97), 701 So.2d 1308, the defendants argued that, because the trial judge did not have the opportunity to view the demeanor of witnesses, the manifest error standard should not apply to the review of his factual findings. The supreme court, however, held that the manifest error standard applies even when the evidence before the trier of fact consists solely of written reports, records or depositions.
The supreme court stated in Shephard that it recognized a good and persuasive argument could be made to lessen the standard of review when evaluations and findings of fact are not based on demeanor evidence. The supreme court further noted that the jurisprudence of a majority of other states held that great deference need not be extended to the trial court when its findings of fact are based on depositions, affidavits and other documentary evidence. Nevertheless, a minority of states adhere to the rule that, even when considering documentary evidence, an appellate court must find clear error to overrule the trial court's finding of fact. After carefully studying this issue, our supreme court found that the proper allocation of trial and appellate functions between the respective courts are better served by the heightened standard of manifest error review.
This is a medical malpractice case in which the issue on appeal concerns the running of prescription. The prescriptive period for medical malpractice is found in La. R.S. 9:5628 which states, in pertinent part, as follows:
No action for damages for injury or death against any physician, ... [or] hospital duly licensed under the laws of this state, ... whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
*805 Generally, the burden of proving that a suit has prescribed rests with the party pleading prescription. When the plaintiff's petition, however, shows on its face that the prescriptive period has expired, the burden shifts to the plaintiff to demonstrate suspension or interruption of the prescriptive period. Wilkes v. Carroll, 30,066 (La.App.2d Cir.12/10/97), 704 So.2d 938. The shifting of the burden means that the plaintiff must allege and prove facts indicating that the injury and its causal relationship to the alleged misconduct were not apparent or discoverable until within one year before the suit was filed. White v. Willis-Knighton Medical Center, 25,575 (La.App.2d Cir.2/23/94), 632 So.2d 1198, writ denied, 94-1024 (La.6/17/94), 638 So.2d 1098.
The one-year prescriptive period commences on the date that an injured party discovers or should have discovered the facts on which to base a cause of action. When a party has sufficient information to incite curiosity, to excite attention or to put a reasonably minded person on guard and call for inquiry, he or she has the constructive knowledge necessary to start the running of prescription. LaGrange v. Schumpert Medical Center, 33,541 (La.App.2d Cir.6/21/00), 765 So.2d 473. The law of prescription does not require that the patient be informed by a medical practitioner or an attorney of possible malpractice before the commencement of the running of prescription. Dixon v. Louisiana State University Medical Center, 33,036 (La.App.2d Cir.1/26/00), 750 So.2d 408, writ denied, 00-0627 (La.4/20/00), 760 So.2d 350.
Constructive knowledge sufficient to begin the running of prescription requires more than a mere apprehension that something might be wrong, but a "reasonable basis for filing suit against a defendant" is sufficient. Kavanaugh v. Long, 29,380 (La.App.2d Cir.8/20/97), 698 So.2d 730, writ denied, 97-2554 (La.5/15/98), 719 So.2d 67. In other words, the simple knowledge that "an undesirable condition has developed at some time after the medical treatment" does not equate to knowledge of everything to which inquiry might lead. The issue is the reasonableness of the patient's action or inaction, in light of his education and intelligence, severity of symptoms and the nature of the defendant's conduct. Kavanaugh v. Long, supra.
Prescription does not run as long as it is reasonable for the plaintiff not to recognize that the condition may be related to treatment. LaGrange, supra. When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment and there is no effort by the health care provider to mislead or cover up information which is available to the plaintiff through inquiry or professional medical or legal advice, then the facts and the cause of action are reasonably knowable to the plaintiff. Inaction by the plaintiff for more than one year under these circumstances is not reasonable. Id.; White v. Willis-Knighton Medical Center, supra; Bossier v. Ramos, 29,766 (La.App.2d Cir.8/20/97), 698 So.2d 711, writ denied, 97-2583 (La.12/19/97), 706 So.2d 463; Chandler v. Highland Clinic, 28,204 (La.App.2d Cir.4/3/96), 671 So.2d 1271. Ignorance of the probable extent of the injuries materially differs from ignorance of actual harm, which delays the commencement of prescription. Dufriend v. Tumminello, 590 So.2d 1354 (La.App. 5th Cir.1991), writ denied, 592 So.2d 1335 (La.1992).
Since Ms. Cruse's claim was filed more than one year after the date of her surgery, the claim was prescribed on its *806 face. The burden, therefore, shifted to Ms. Cruse to show that the discovery rule, which delays the commencement of the prescriptive period, operated in this case to prevent her claim from prescribing. In other words, Ms. Cruse must show that the alleged malpractice occurred within one year from the date of discovery.
As the previously discussed depositions show, there was conflicting testimony concerning whether Ms. Cruse was told that it would take two years for her to recover from the surgery. Her testimony and the testimony of Dr. Cunningham were totally at odds on this point. In addition, the testimony of Dr. Gregg did not bolster Ms. Cruse's position in this regard. Under the circumstances of this case, Ms. Cruse could not carry her burden of proof without proving this crucial fact. Considering the conflicting evidence on the point, we cannot conclude that the trial court committed manifest error in finding that Ms. Cruse failed to carry her burden of proof.
We also find significant Ms. Cruse's admission in both her answers to interrogatories and in her deposition testimony that, after looking at her breasts post-surgery, Dr. Gregg told her that "they" had "messed her up." She further agreed that the last time she had seen Dr. Gregg was in March 1996. Based on this admission, it is reasonable to conclude that Ms. Cruse either recognized or should have recognized that her condition was related to the breast reduction surgery in March 1996.[2] See LaGrange, supra. This would mean that Ms. Cruse would have had until March 1997 to file suit, which she did not do. Again, we agree with the trial court that Ms. Cruse's claim had prescribed. In so finding, however, we remain mindful that there may exist circumstances in which a plaintiff does not "discover," within the meaning of 9:5628, the alleged act, omission or neglect until after the expiration of the advised "healing time" as provided by the plaintiffs treating doctor(s). We, therefore, limit our holding in the case sub judice to the particular facts of this case.

CONCLUSION
For the foregoing reasons, the judgment of the trial court sustaining Defendant's, Louisiana State University Health Sciences Center-Shreveport, Exception of Prescription is affirmed. Costs are assessed to Plaintiff, Traci Book Cruse.
AFFIRMED.
NOTES
[1] Defendant is named as Louisiana State University Medical Center-Shreveport in Plaintiff's complaint and this appeal is styled the same. Defendant notes in its pleadings, however, that the institution has changed its designation to Louisiana State University Health Sciences Center. Since the latter is the correct name of the institution at this time, we will refer to it as such in this opinion.
[2] We note that Dr. Gregg denied ever making this statement to Ms. Cruse. It is, however, Ms. Cruse's state of mind, or her knowledge of the doctors' alleged acts, omissions or neglect, with which we are concerned in determining when prescription commenced running on her malpractice claim. Ms. Cruse maintains that she was told by Dr. Gregg, whom she saw in February and March 1996, that "they messed her up" ("they" being the doctors who had performed her breast reduction surgery). In light of the post-surgery problems Ms. Cruse was experiencing in the area of her breasts, we believe that this is an admission of her having been put on notice that her condition may have been the result of acts, omissions or neglect on the part of the doctors at LSU Health Sciences Center.