810 So.2d 1203 (2002)
Diana Marlyne STETT, Gregory J. Stett, individually and as the administrators of their minor child, Lauren Diane Stett, and Carrie Allison Stett and Chad Alan Stett, individually, Plaintiffs-Appellants,
v.
Carol B. GREVE, B.C.S.W, Defendant-Appellee.
No. 35,140-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 2002.
*1205 Donald L. Kneipp, Monroe, for Appellants.
Davenport, Files & Kelly, L.L.P., by M. Shane Craighead, Monroe, for Appellee.
Before BROWN, WILLIAMS, CARAWAY, KOSTELKA and DREW, JJ.
CARAWAY, Judge.
Trial on the exception of prescription occurred in this case to determine whether the alleged malpractice of the defendant/therapist prescribed before the institution of suit on August 19, 1996. The therapy rendered by the defendant began in 1989, and the last conversation between the parties was on August 23, 1995, the only time within the year preceding the suit that therapy might have been given. The defendant presented evidence that the parties terminated the therapeutic relationship in June 1995, and the trial court agreed, dismissing plaintiffs' suit on the exception of prescription. Finding that no continuing tort occurred and that the doctrine of contra non valentem was not proven by plaintiff, we affirm the trial court's ruling.

Facts
In this malpractice case, Diana Stett ("Stett") and her family sued Stett's therapist, Carol Greve ("Greve"), a Board Certified Social Worker. Stett started therapy with Greve in November, 1989, while Stett's suit against a prior therapist was underway. Greve was the treating therapist for the duration of that suit, wherein Stett alleged that she was a victim of therapist abuse. Stett purportedly received a large settlement for the first suit. When Stett began therapy with Greve, her treating psychiatrist was Dr. Douglas Greve, who was also Greve's husband.
The therapy was initially conducted in Shreveport. When Greve moved to New Orleans in January, 1991, therapy was terminated briefly. After four months, and at Stett's request, therapy resumed by telephone. The therapy sessions were conducted on the condition that Stett continue to see a local therapist in Shreveport and remain under the care of her psychiatrist. Ultimately, Stett's relationship with Greve grew contentious. At the hearing on the exception, Greve described Stett as:
[a] very difficult patient to manage. She was unstable, oppositional, argumentative, very unpredictable, frequently non-compliant especially when it came to taking her medication.
The weekly telephone therapy sessions continued between May, 1991, and November, 1994, except when punctuated by Stett's in-patient psychiatric hospitalizations. Greve testified that she treated Stett only as an outpatient. During Stett's *1206 hospitalizations, the psychiatric staff would care for her. Stett would frequently complain to Greve that Greve "wouldn't talk to her enough times, that [Greve] would refuse sessions with her [and] that she couldn't have enough access to [Greve] when she would call." Greve reported that generally, Stett requested extremely frequent and long therapy sessions outside of their scheduled weekly sessions. Stett wrote letters and telephoned Greve frequently. At the hearing, Greve estimated that Stett sent her as many as 100 letters during the course of therapy. Some letters accuse Greve of treating Stett worse than other patients because of Stett's suit against her former therapist. One letter dated July 22, 1994 accuses Greve of being "paranoid." According to Greve, Stett's conduct placed intolerable stress on their therapeutic relationship, and therapy could not occur in that context. When Greve terminated therapy in June, 1995, she described their relationship as having become "more of an argument."
On November 23, 1994, Stett telephoned Greve at her New Orleans office 381 times. In response, Greve sent Stett a termination letter dated November 26, 1994, by certified mail. Greve terminated therapy because Stett had "adamantly refused to follow [Greve's] therapeutic advice, direction or treatment plan." The letter also stated that Greve would no longer accept telephone calls or respond to Stett's written messages. However, Greve said that Stett refused delivery of the letter, and indeed the certified mail receipt does not bear Stett's signature.
Greve explained that in spite of the termination letter, Stett altered her behavior with regard to the telephone calls and therapy continued for another 5 or 6 months. However, on June 21, 1995, Stett telephoned Greve's home at 9:30 p.m., in spite of having agreed not to call Greve at home. Greve talked with her for a few minutes and ended the phone call. Thereafter, Stett "started calling repeatedly, one call after the other." The next morning, Greve notified Stett by phone that, because of the persistent calls, their therapeutic relationship would terminate within 30 days. Greve offered Stett four weekly sessions during the 30-day interval in which to deal with termination and find a new therapist. This was Greve's customary practice regarding terminations, but Stett refused this offer. According to Greve, this conversation was the last time that she provided advice or therapy to Stett. During that day and the next, Stett faxed a total of four letters to Greve, begging her not to terminate therapy. The last letter was signed, "goodbye, Diana." Thereafter, Stett's husband called Greve on Sunday evening, June 25. When Greve returned his call the next day, Greve gave Stett's husband the same information concerning referrals that she had given Stett and offered to set up one of the four termination sessions with Stett.
On June 29, 1995, Stett wrote Greve a letter in which she repeatedly asked Greve to reconsider termination. In a handwritten addendum to this letter, Stett stated that her condition worsened and it was partly Greve's fault. In another letter to Greve dated June 29, 1995, Stett advised that she had seen a new therapist, Mary Beth Stage. She also wrote:
Will you reconsider terminating? If you decide no, may I have a last phone call? Will you give me some kind of response that you will think about it, yes, maybe, no, by this week or end of next week, July 7? Please don't let this end like (sic) Linda situation. One issue that comes up when you ignore or avoid is that you are in fact doing just what I am suspicious of you and you don't want me to ask questions. It turned out with Linda, that I was not wrong. I do not want this to be the same.
*1207 The "Linda situation" was shown at trial to be the prior suit by Stett against another therapist, Linda Watts, which Stett successfully settled in 1994. The June 29 letter also refers to "the Paul Ware legal stuff going on." According to Greve, this was a reference to yet another lawsuit. The record reveals that in addition to the instant suit, and the lawsuit against her former therapist, Stett was suing two former psychiatrists and the attorney who settled the Watts lawsuit.
Stett called Greve again on July 30, 1995, from River Oaks Hospital but neglected to inform Greve that she was hospitalized. Greve reiterated that she could not treat Stett any longer because of Stett's unreasonable demands for contact and her "bombarding" of Greve's office, answering service and home with telephone calls. Greve testified that she did not provide any therapy to Stett during this telephone call. Once Greve realized Stett was an inpatient, Greve told her to talk to her therapist there and if they needed to contact Greve, the hospital staff would do so.
Stett's next and final phone call to Greve occurred on August 23, 1995, after Stett received Greve's final bill. At trial, Greve described Stett as being "in a rage" over the bill because Greve charged Stett differently from other patients. Greve testified at the hearing that Stett's condition was not discussed and that no therapy was provided during the August 23 call. Stett taped this phone conversation unbeknownst to Greve. The existence of the taped conversation was not revealed to Greve or her counsel prior to Greve's testimony despite Greve's previous discovery requests which should have revealed the tape's existence. The trial court refused to allow the tape into evidence, since plaintiffs' counsel failed to disclose its existence to the defendant and since Stett was not present at the hearing to authenticate it.
Finally, Stett wrote Greve on September 18, 1995, requesting her medical records. On September 22, 1995, Greve wrote Stett another termination letter, and again cited Stett's refusal to follow Greve's advice, direction and treatment plan as the reason for termination. Also on September 22, Greve wrote a letter to Stett's attorney and enclosed a copy of her letter to Stett. Greve testified regarding these September 22 letters, as follows:
I think it was clear that these letters were sent to Mr. Hammons [Stett's counsel] as a result of Mrs. Stett writing me and asking for her records. She had refused the letters that I had sent to her before. I knew I had no intention of sending her a letter of termination. I terminated Diana Stett by the telephone.
The Stetts filed suit on August 19, 1996, urging inter alia that Greve was negligent for misdiagnosing Stett, failing to develop and follow a consistent treatment plan, creating an unstable environment, failing to establish and maintain consistent boundaries and terminating and reestablishing the therapeutic relationship. On January 11, 1999, Greve filed an exception of prescription. The hearing on the exception, initially scheduled for February 1, 1999, was continued and reset four times by agreement of counsel. On November 13, 2000, Greve was present with counsel. Stett's third enrolled counsel of record was present, but neither Stett nor her husband appeared. According to Stett's attorney, she had informed him the day before the hearing that she was ill; she was purportedly at a doctor's office while the hearing took place. The Stetts now live in Dallas.
Stett's attorney repeatedly asked the court to "leave the record open" to permit his client to submit her testimony. The trial court denied the request, citing the number of continuances and the lack of a *1208 doctor's excuse for Stett's absence. No medical report verifying Stett's illness on the day of trial is contained in the record.
The trial court granted the exception of prescription and dismissed Stett's suit with prejudice. In oral reasons for judgment, the trial court found that Stett was an "accomplished litigator," particularly with regard to therapists, and that she had been represented by counsel during the entire time she underwent therapy with Greve. The court cited Stett's letters, particularly the letter of June 29, 1995, as evidence that Stett knew of and acknowledged Greve's termination of their therapeutic relationship. The trial court also observed that the August 23, 1995 telephone call was initiated by Stett, not Greve, and that Stett's taping of the conversation was consistent with the defense counsel's argument that Stett was "trying to create or trying to build a lawsuit because she understood what had happened, she knew the relationship had been terminated." It is from this ruling that Stett appeals.

Discussion

I.
At the outset, we note that this malpractice case against a social worker was filed in 1996, long before the addition of social workers to the definition of health care provider in the medical malpractice statute. See Acts 1999, No. 1309 § 8, effective January 1, 2000. Accordingly, there was no need to present the matter in this case to a medical review panel before plaintiffs filed suit in district court. Likewise, the special prescription statute for medical malpractice suits, La. R.S. 9:5628, is inapplicable, and the one-year prescription for tort claims applies.
Generally, the burden of proving that a suit has prescribed rests upon the party pleading prescription as an affirmative defense. Dixon v. Louisiana State Univ. Medical Ctr., 33,036 (La.App.2d Cir.1/26/00), 750 So.2d 408, writ denied, XXXX-XXXX (La.4/20/00), 760 So.2d 350; Cruse v. Louisiana State Univ. Medical Ctr., 34,779 (La.App.2d Cir.6/20/01), 792 So.2d 798. When it is not obvious from the face of the petition that the claim is prescribed, the burden rests on the defendant or party pleading prescription. Strata v. Patin, 545 So.2d 1180 (La.App. 4th Cir.), writ denied, 550 So.2d 618 (La.1989). However, once it is shown at the trial of the exception that more than one year has elapsed between the time the tort occurred and the filing of suit, the burden shifts to the plaintiff to prove an interruption or suspension of prescription, due to his lack of knowledge of the tortious act. In re Moses, 2000-2643 (La.5/25/01), 788 So.2d 1173; Dixon, supra; Strata, supra. The shifting of the burden means that the plaintiff must allege and prove facts indicating that the injury and its causal relationship to the alleged misconduct were not apparent or discoverable until within one year before the suit was filed. Cruse, supra.
When tortious conduct and resulting damages are of a continuing nature, prescription does not begin until the conduct causing the damages is abated. Bustamento v. Tucker, 607 So.2d 532 (La. 1992); Doe v. Doe, 95-0006 (La.App. 1st Cir.10/6/95), 671 So.2d 466, writ denied, 95-2671 (La.1/12/96), 667 So.2d 523. The principle of a continuing tort applies only when continuous conduct causes continuing damages. Doe, supra. The continuous nature of the conduct complained of has the dual effect of rendering such conduct tortious and of delaying the commencement of prescription. Bustamento, supra. The conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature and prescription does not commence until the last act occurs or the conduct is abated. Id.
*1209 To soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non valentem non currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La. 1992); Lima v. Schmidt, 595 So.2d 624 (La.1992). The doctrine is based on the equitable principle that prescription should be suspended when a plaintiff is effectually prevented from enforcing his rights for reasons external to his own will. Wimberly v. Gatch, 635 So.2d 206 (La.4/11/94); Steele v. Steele, 98-693 (La.App. 5th Cir.3/10/99), 732 So.2d 546, writ denied, 99-0995 (La.5/28/99), 743 So.2d 674. Generally, contra non valentem suspends the running of prescription in the following four situations: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the defendant himself has done some act effectually to prevent the plaintiff from availing himself of his cause of action; and (4) where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Steele, supra. The last two categories of contra non valentem arguably apply in the instant case.
For example, the principle known as the "continuous representation rule," based on the third application of contra non valentem, has been held to suspend prescription during an attorney's continuous representation of a client regarding the specific subject matter in which the alleged wrongful act or omission occurred. Hendrick v. ABC Ins. Co., 2000-2349, 2000-2403 (La.5/15/01), 787 So.2d 283. However, contra non valentem does not suspend prescription when a litigant is perfectly able to bring his claim, but fails to do so. Hendrick, supra.
The fourth category, commonly called the "discovery rule," provides that prescription begins when the injured party discovers or should have discovered the facts upon which her cause of action is based. Hence, prescription does not run against one who is ignorant of the facts upon which her cause of action is based as long as such ignorance is not willful, negligent or unreasonable. See Senn v. Bd. of Supervisors of Louisiana State Univ. Agric. & Mechanical College, 28,599 (La. App.2d Cir.8/21/96), 679 So.2d 575, writ denied, 96-2344 (La.10/25/96), 681 So.2d 379. This does not mean that a lack of actual notice of a cause of action will suspend prescription, as constructive notice is sufficient to commence the running of prescription. Strata, supra.
In this court's decision in Senn, supra, we rejected a claim that the plaintiff's prior relationship with her college professor had caused the psychological impairment of the plaintiff which prevented her from bringing the action and barred the running of prescription under contra non valentem. Likewise, in Strata, supra, the court did not find that the plaintiff/husband's emotional trauma caused by his discovery of an affair between his wife and his priest was sufficient to invoke the doctrine of contra non valentem. In both of these cases, the courts' rulings considered the expert testimony given by psychiatrists attempting to establish the plaintiffs' impaired conditions.
When a special relationship, such as patient-physician or attorney-client, exists between the parties, the continuation of the special relationship offers the possibility of correcting any injury and thus may postpone the running of prescription. See In re Moses, supra. Continued *1210 treatment combined with a continued professional relationship may result in a suspension of prescription if the continuing relationship is likely to hinder the patient's inclination to sue. Id. This type of tolling of prescription is not based on the continuing tort concept, rather it is based on the third category of contra non valentem and the above premise that a professional relationship may hinder a patient's inclination to sue; thus, prescription is tolled until the relationship terminates. See Kavanaugh v. Edwards, 32,413 (La. App.2d Cir.12/8/99), 749 So.2d 824, writ denied, XXXX-XXXX (La.5/5/00), 761 So.2d 543; In re Brown, 97-2803 (La.App. 4th Cir.7/1/98), 715 So.2d 1249, writ denied, 98-2020 (La.11/6/98), 728 So.2d 390, cert. denied, 526 U.S. 1050, 119 S.Ct. 1356, 143 L.Ed.2d 518 (1999). The "termination rule" is a particularized application of the discovery rule. In re Moses, supra.
Stett's petition alleges the history of the counseling given by Greve and states that the professional relationship did not terminate until September 22, 1995. Two paragraphs of the petition which best describe Greve's allegedly negligent conduct, assert:
"10.
The defendant's failure to develop and follow a consistent treatment plan for Diana Stett created and perpetuated an unstable environment for plaintiff, further exacerbating the trauma and mental distress plaintiff was suffering from. Adding to the unstable environment was defendant's termination of the professional relationship based on plaintiff's lack of medical backup."
"13.
During the course of treatment defendant knew that plaintiff Diana Stett had been severely traumatized by prior abusive therapeutic relationships and that she had a history of developing psychotic transference to her therapist. Despite this knowledge, and knowing that Diana Stett had developed a dependency on herself (the defendant), defendant subjected Diana Stett to severe mental torture by at times limiting access to desperately needed therapy and counseling from defendant, terminating the relationship, and then reestablishing the relationship, all without setting proper boundaries and without an accurate diagnosis and treatment plan."
The face of the petition did not clearly indicate that all of the acts of Greve's alleged malpractice inflicted upon Stett had prescribed. Stett arguably claimed a continuing tortious relationship that only ended in September 1995, which was within one year of the filing of this suit. Thus, at the trial of the exception, Greve undertook the burden of proving that she terminated her relationship with Stett on June 22, 1995 and that Stett thereafter acknowledged the termination. Greve's proof regarding her termination of counseling was established by her testimony, her notes of her June 22 telephone call to Stett and Stett's six written responses acknowledging the termination. Stett's written responses were sent to Greve on June 22, 23, and 29. The last letter dated June 29 indicates that Stett attempted to begin a new counseling relationship with another person, yet pleaded with Greve to "reconsider" the termination of their relationship.
Upon Greve's proof that the break in the parties' relationship clearly occurred at the end of June, 1995, Greve established that the alleged malpractice would have occurred well over one year from the time of the filing of suit on August 19, 1996, and had prescribed. Stett therefore had the burden of establishing facts for either of the two potential theories now suggested to overcome prescription.
*1211 First, while Stett urges that her June 29 letter to Greve was not the final communication between them, the significant break between the parties reflected by that communication required Stett to explain and establish why Greve's prior negligent acts of counseling before June should be considered as one continuing tort. If there had been a "continuous, cumulative, synergistic" pattern of deficient counseling by Greve, analogous to the continuing tort addressed in Bustamento, Stett had to reveal this continuing tortious conduct so that a determination could be made that those actions before the June correspondence did not prescribe and did not abate, but instead were perpetuated by the relatively few communications between the parties after June. Second, if Stett could not prove that Greve's negligent counseling constituted a continuing tort extending beyond August 19, 1995, she was required to establish facts demonstrating that, under the doctrine of contra non valentem, she was prevented from reporting or having knowledge that Greve's actions harmed her.
The "mental distress" and "severe mental torture" alleged in Stett's petition are not merely critical elements of Stett's cause of action that need only be proven at trial on the merits. These allegations required proof at the trial of the exception of prescription to establish either a continuing tort or contra non valentem that extended beyond August 19, 1995. Nevertheless, Stett's defense strategy for the trial of the exception was to have consisted only of her own testimony, as discussed further below, and the documentation concerning Greve's correspondence to Stett and her attorney from May, 1994, until September, 1995. Absent expert testimony, Stett failed to identify the standard of care which the defendant/therapist allegedly breached, both initially and continuously, so as to establish a continuing tort. Stett simply may not rest upon the allegations of her petition. Likewise, without psychiatric testimony to establish Stett's psychological impairment, we must accept Stett's letters to Greve at the end of June as acknowledgments of the termination of Greve's services and as indications that Stett was displeased with those services.
We therefore agree with the trial court that the therapist/patient relationship terminated at the end of June, 1995 and that Stett did not prove why she could not have known of or acted upon her cause of action against Greve at that time. In reaching this conclusion, we do not agree with Stett's assertion that Greve's September 22 letters to Stett and her counsel somehow reestablished the therapist/patient relationship. The letters were further notice that the relationship had ended, and were clearly not acts of negligent therapy that might have somehow extended the alleged, but unproven, continuing tort or caused Stett to be unable to assert her cause of action.

II.
When the trial court announced the hearing on the exception of prescription the morning of trial, Stett's counsel informed the court that Stett had notified him the previous evening that she could not attend because she was ill. When counsel requested that the record of the trial proceedings remain open for Stett's deposition to be taken at a later time, Greve's counsel objected. The trial court then proceeded to move the case to its afternoon docket. At the afternoon setting, plaintiffs' counsel informed the court that he had communicated with Mr. Stett at noon and that Mrs. Stett was at her doctor's office. He asserted that Stett's testimony would be necessary to establish the substance of the parties' telephone conversation occurring on August 23, 1995, and again asked that the record remain *1212 open for her deposition testimony. The court denied that request. Additionally, at the close of the trial, the trial court again denied counsel's request to leave the record open. Stett now urges that the trial court erred in making these rulings.
The trial court is granted broad discretion in conducting a trial and in determining whether to receive or refuse testimony. Turner v. Stassi, 33,022 (La.App.2d Cir.5/10/00), 759 So.2d 299, 307; Ware v. Medical Protective Ins. Co., 621 So.2d 54 (La.App. 2d Cir.), writ denied, 629 So.2d 354 (La.1993). Likewise, the trial court's discretion in granting or denying a continuance under La. C.C.P. art. 1601 must be based upon consideration of the facts of each case and factors such as diligence, good faith, and reasonable grounds. Our Lady of the Lake Hosp. v. Vanner, 95-0754 (La.App. 1st Cir.3/27/97), 692 So.2d 40, writ denied, 97-1567 (La.9/26/97), 701 So.2d 992, cert. denied, 525 U.S. 818, 119 S.Ct. 57, 142 L.Ed.2d 45 (1998). Equally important is the exceptor's corollary right to have his case heard as soon as practicable. Id.
The decision to reopen a case for additional evidence rests within the discretion of the trial judge, whose discretion will not be disturbed on appeal unless manifestly erroneous. Brown v. Hobson, 30,131 (La.App.2d Cir.1/21/98), 706 So.2d 1030, 1032-1033, writ denied, 98-0479 (La.4/3/98), 717 So.2d 1132, citing La. C.C.P. art. 1632; Krolick v. State, through Dep't. of Health and Human Resources, 99-2622 (La.App. 1st Cir.9/22/00), 790 So.2d 21, writ denied, XXXX-XXXX (La.2/9/01), 785 So.2d 829. In Antley v. Brantly, 28,049 (La.App.2d Cir.2/28/96), 669 So.2d 685, 688, this court said:
On the other hand, in order to prevent a miscarriage of justice, a trial court should not hesitate to reopen a case for the taking of additional evidence, or to grant a new trial when properly requested, and an appellate court should not hesitate to set aside the ruling of a trial court on such matters in a case of manifest abuse of discretion. See Lamb v. Lamb, 430 So.2d 51 (La.1983).
In refusing to allow Stett's testimony by post-trial deposition, the trial court noted the many prior continuances for the hearing on the exception. Likewise, the trial court noted that no proof in the form of a doctor's examination was provided as evidence of Stett's sudden illness. Mr. Stett, also a plaintiff in this action, and who had discussed with Greve the June 1995 termination of counseling, also chose not to attend.
Most significantly, Stett's counsel suggested to the trial court that Stett's testimony was required to dispute Greve's version of the parties' last telephone conversation of August 23, 1995. Stett asserts that conversation is the last "therapy" session between the parties. It is the only conversation which occurred within the one-year prescriptive period prior to the filing of this suit. On cross-examination, Greve was asked questions concerning various portions of the August 23 conversation in which she and Stett purportedly discussed Stett's prior treatment and her condition. Stett's counsel revealed to the court that his cross-examination was based upon an actual transcript of the conversation which Stett had secretly taped. Although Greve did not remember those specifics of her conversation with Stett upon which she was cross-examined, she did not deny that those matters may have been brought up in the conversation. Greve denied however that she gave therapy to Stett and testified that the phone call to her home was made by Stett to dispute Greve's final bill for services which Stett had received.
From our review of the cross-examination questions posed to Greve, we do not *1213 find that a therapy session occurred under those circumstances, even if we assume that the matters regarding Stett's condition were alluded to in the conversation. Moreover, Stett offered no evidence at trial nor in argument to the trial court or this court to establish why the August 23, 1995, conversation constituted malpractice by Greve and how that single act of alleged malpractice related to all of the prior therapy given by Greve outside of the one-year prescriptive period. Under these circumstances, the trial court's discretionary refusal to allow Stett's post-trial testimony regarding the August 23 telephone conversation is justified on the basis that Stett's testimony alone could not fulfill her burden of proving either a continuing tort or the defense of contra non valentem. Accordingly, we find no abuse of the trial court's discretion in refusing to receive Stett's testimony after the trial.

Conclusion
For the reasons discussed above, the trial court correctly determined that prescription ran against plaintiffs. The grant of defendant's exception of prescription is affirmed. Costs of appeal are assessed to appellants.
AFFIRMED.
WILLIAMS, J., dissents with written reasons.
DREW, J., dissents for the reasons assigned by J. WILLIAMS.
WILLIAMS, Judge.
I respectfully dissent.
The trial court is granted broad discretion in conducting a trial and in determining whether to receive or refuse testimony. Turner v. Stassi, 33,022 (La.App.2d Cir.5/10/00), 759 So.2d 299; Ware v. Medical Protective Ins. Co., 621 So.2d 54 (La. App. 2d Cir.1993), writ denied, 629 So.2d 354 (La.1993). This discretion includes the decision of whether to reopen a case for additional evidence and the trial court's determination will not be disturbed on appeal absent an abuse of discretion. Brown v. Hobson, 30,131 (La.App.2d Cir.1/21/98), 706 So.2d 1030, writ denied, 98-479 (La.4/3/98), 717 So.2d 1132, citing LSA C.C.P. art. 1632.
The decision to hold the record open for additional evidence is akin to the decision to reopen a case for the taking of additional evidence. Further, although the Stetts' counsel did not seek a continuance, the decision to hold the record open involves many of the same concerns that apply to the decision to grant a continuance. In Gilbert v. Visone, 32,303 (La.App.2d Cir.10/27/99), 743 So.2d 909, we explained the review of a trial court ruling on a motion for continuance:
Under the provisions of La. C.C.P. art. 1601, a continuance may be granted in any case if there is good ground therefor. The trial court has great discretion in granting or denying a motion for a continuance under this provision; that discretion will not be disturbed on appeal in the absence of a clear abuse of discretion. However, an abuse of discretion occurs when such discretion is exercised in a way that deprives a litigant of his day in court. Whether a trial court should grant or deny a continuance depends on the particular facts of each case. Some factors to consider are diligence, good faith and reasonable grounds. Of equal importance is the other litigants' corresponding right to have the case heard as soon as practicable.
The evidence in the record does not show that the Stetts were in bad faith when they requested that the court hold the case open, that their request was calculated to obtain a strategic advantage or that Greve would be prejudiced if the case was held open. Thus, on appellate review, *1214 the sole question is whether the court's refusal to hold the case open to obtain Stett's testimony was an abuse of discretion ultimately denying the appellants their day in court.
As factors in denying the request to hold open the record, the district court stated that Stett failed to provide a doctor's report as proof of sudden illness and noted that there had been a number of prior continuances. However, the record indicates that Stett was being treated at the time of the hearing and plaintiffs should have been given a reasonable opportunity to obtain a medical report. In addition, the plaintiffs should not have been penalized for the four prior continuances, which were arranged by mutual consent of counsel.
Although Greve asserted that she had terminated the therapy in June 1995, her testimony reflects a pattern of treatment which was interrupted and then resumed on more than one occasion. After a thorough review of the record, I cannot say that the evidence as it stands conclusively demonstrates prescription. Stett's letters are general in nature expressing her discontent with the status of the therapeutic relationship and her concern about the possible termination of therapy. The correspondence must be considered in the context of the history of the therapy relationship. In January 1991 and again in November 1994, treatment was purportedly "terminated" by Greve, only to be resumed at a later time.
Thus, contrary to the findings of the trial court and the majority, the letters do not show that Stett was aware that the therapy relationship was finally "terminated" on June 22, 1995. In fact, Greve acknowledged that on the same date she offered additional therapy to Stett over the next 30 days. Greve also stated that she did not send a "final" bill to Stett until August 21, 1995. Up until this point, Stett could have maintained an expectation that her therapy with Greve would resume as had happened in the past.
Furthermore, Greve's letter to Stett on September 22, 1995 regarding the termination of the treatment raises the issue of the exact date when the patient-therapist relationship was terminated. Thus, Stett's testimony is essential to a determination of whether the action had prescribed and the record should have been held open for receipt of this evidence. Such an outcome would not have surprised or unduly prejudiced the defendant and is consistent with prior cases in which this court has stated that a court should not hesitate to reopen or leave open a case for additional evidence when no injustice would be done. See Brown v. Hobson, 30,131 (La.App.2d Cir.1/21/98), 706 So.2d 1030, writ denied, 98-479 (La.4/3/98), 717 So.2d 1132; Antley v. Brantly, 28,049 (La.App.2d Cir.2/28/96), 669 So.2d 685.
Consequently, I must conclude that the district court abused its discretion in refusing to hold open the case to allow Stett to testify, essentially depriving the plaintiffs of their day in court. Accordingly, I would reverse the judgment and remand for receipt of Stett's testimony.